PATTERSON *et al.*, *vs.* HICKEY.

Where the question is *revocavit vel non*, parol evidence, as to the acts and declarations of the testator, are admissible, although made at any time between the making the will and the death of the testator.

Issue of *devisavat vel non*, in Chattahoochee Superior Court.

Tried before Judge PERKINS, at the May Term, 1860.

The facts and questions in this case, as gathered from a somewhat meagre record, are as follows:

On the 31st day of March, 1854, James Hickey executed a will, disposing an estate, consisting of lands, negro slaves, and choses in action, worth, in the aggregate, $50,000 00, or more. The record contains no copy of the will, and its provisions are, therefore, not given. At the time the will was executed, the testator requested the witnesses to keep it secret, giving as a reason therefor, that if its provisions were known, it might produce hard feelings, and that he might not then die, and also might thereafter wish to change his will. Contemporaneous with the execution of the will, there were difficulties existing, and lawsuits pending between the testator and Robert C. Patterson, the husband of his deceased daughter, and the widows of two of his deceased sons, relating to some land and negroes received by his said sons in their lifetime, and by said Patterson in the lifetime of his wife, from the said testator. The said sons and daughter of testator left children surviving them. Besides these grandchildren, the testator had one son, James B. Hickey, and one daughter, a Mrs. Jones, living at the time the will was made. Between the time of making the will and his death, in 1859, the testator largely increased his property, and the lawsuits between him and his grand-children, were all compromised and settled, and friendly relations between him and his son-in-law and daughters-in-law were fully restored. The testator died, and the will, made as aforesaid, was found in a bureau drawer, separate from the testator's other papers, and in a place where he did not usually deposit his papers for safe keeping. The will was written on one whole sheet of paper, and when presented for probate, it was in two pieces, and had the appearance of having been cut, or torn, in two pieces. The draftsman who wrote the will, and who was one of the attesting witnesses to the same, testified that, in his opinion, the will was not worn in two pieces, as the edges of the paper were even and smooth, and did not look as if it had been worn. Although the will was in two parts, no word or sentence of the same was changed, obliterated, or destroyed. The testator's wife, his son, James B. Hickey, and his daughter, Mrs. Jones, were all present when the will

was executed.   The testator's wife stated what property she wanted, and how it should be given, and the will was written in accordance with her wishes, which were assented to and approved by the testator.   So it was with the property given to Mrs. Jones.

After the testator's death, the will was propounded, and offered for probate, and recorded by James B. Hickey, and a *caveat* was filed by Robert C. Patterson and others, in behalf of the children of the testator's deceased sons and daughter. On the trial of the case, the facts before stated appeared in evidence, together with a good deal of testimony as to what and how much property had been given by testator, in his lifetime, to his children. · It was also proven that the testator, in speaking of the will to his wife, said :   "Old lady, that is a thing I thought I never would do; the laws of our country was as good a will as I wanted."

In the progress of the trial, the *caveators* proposed to prove that after the will was made, the testator said, " that he intended his children and grand-children should share equally in his property."

Also, " that it was a part of the understanding in the compromise of the law-suits, that the testator would make all his children equal in the division of his property."

Also, " that the testator agreed, in order to bring about a settlement of the law-suits, he would make his property equal among his grand-children."

Also, " that the testator promised Mary C. Hickey, the widow of his deceased son, Alexander C. Hickey, that, at his death, he would give her children an equal share of his property with his other children, and that this promise caused the said Mary C. Hickey to make a compromise of the law-suit then pending between the testator and herself, and that this conversation and promise took place in 1856."

Also, " that the testator said that he knew what he had given his other children, and that he would keep an account of it, and when he was done with his property, he intended that all his children should have an equal share."

Upon objection made thereto, by counsel for the pro-

pounder, the presiding Judge repelled all the evidence aforesaid, offered by the *caveators*, to which decision said *caveators* excepted.

The jury returned a verdict for the propounder, and the will was accordingly set up.

The plaintiffs in error ask a reversal of the judgment, on the ground, that the presiding Judge erred in excluding the testimony offered by *caveators*, as aforesaid.

JOHNSON & SLOAN for plaintiffs in error.

HOLT & HUTCHINS for defendant in error.

*By the Court*—LUMPKIN, J., delivering the opinion.

*Revocavit vel non* is similar to the question of *devisavat vel non*, and is a question of fact for the consideration of a jury. Powell on Devises, 6, 34; 3 Wilson, 508. *Ad questiones facti respondent juratores.*

Was the Court right in excluding from the jury the declarations and acts of the testator, for the purpose of showing the *quo animo* with which the will propounded for probate was torn or cut in two.

The will was kept by the testator after it was written; and found in the drawer of his secretary, torn or cut asunder. The presumption of the law is, that the act of mutilation was done by the testator; and, if done unintentionally by him, or by the fraud or accident of some other person, it is incumbent upon those claiming under the will to prove it. Those setting up title, under a will, must show, affirmatively, a valid existing will, uncancelled at the time of the testator's death. The instrument has no force or effect till the death of the testator. It is said to be ambulatory till the testator dies. Until then, the party making it has the power to cancel or revoke it. "The general rule is, that a will once executed remains in force, unless revoked by some act done by the testator, *animo revocandi*—such as burning, canceling, making a new will, or the like."—Per Sir John Nicholl, in Johnston vs. Johnston, 1 Phillimore, 446.

The question of revocation, I repeat, then, is one of evidence. Here the execution of the will is established. It is found, after the testator's death, but in an unusual place, and not where he was in the habit of keeping his valuable papers. It is produced for probate, cut or torn in two pieces. The law imputes the act to no other person than the testator. In the absence of proof, does not the law presume that the testator destroyed it—*animo revocandi?* And, in such a case, *at least,* will not the *caveators* be permitted to introduce the *parol* declarations of the testator to confirm the legal presumption deducible from the facts themselves?

But call this, if you please, an equivocal act. Shall not the testimony of the witnesses, which was offered and rejected, be received for the purpose of ascertaining the intent with which this will was mutilated?

This question is not controlled by authority. Courts distinguished for their learning, and eminent Judges, have differed upon it. Not concealing the fact, that my leaning is always in favor of admitting rather than rejecting testimony, I cannot concur with the circuit Judge in ruling out the evidence.

All the Courts agree, that declarations made prior to, or at the time of the execution of the will, or its revocation, are admissible. The judicial mind, both in England and in this country, is divided as to whether it should not be so restricted. In some of the earlier English cases, as in Nelson against Oldfield, (2 Vernon, 76,) this kind of evidence was admitted without question.

In Brady vs. Cubitt, (Douglas, 49,) Lord Mansfield laid it down, that the presumption of a revocation was liable to be rebutted, (and of course sustained,) by "*every kind of evidence.*" This is very strong, and Buller, J., in the same case said, that implied revocations must depend on the circumstances, at the time of the testator's death; which circumstances, I presume, cannot be known without a resort to *parol* testimony.

In the case of Warren vs. Matthews, (Vesey,) evidence was received in opposition to the probate of a will, that a

subsequent *unfinished* will was made by the testator, and of many declarations of the testator, showing he was not satisfied with the will before the Court. All the testimony was received and relied on without opposition.

More modern cases, at least some of them, have refused to allow this species of proof. (Provis vs. Reed, 5 Bingham, 435). In Jackson, *ex dem.*, Coe, and others, against Kniffin, 2 John's Rep., 31, *parol* evidence of the revocation of a will was held to be inadmissible. Thompson, Kent, and Livingston concurring, Ambrose, Spencer, and Tompkins dissenting; and the Supreme Court decided that this evidence was properly rejected. (6 Cowen's Rep., 382). Chancellor Walworth, in the case of Betts vs. Jackson, 6 Wendell, 187, thus expresses himself upon this doctrine: "In the investigation of the other questions in this cause, I have necessarily been compelled to look into this subject, so far as to see there is sufficient doubt as to the correctness of the Supreme Court decision on the point, to authorize them to direct a re-argument of the question, if it shall again come before them. The frequent insincerity of testamentary declarations, and the great danger that the meaning of the testator may be mistaken or misrepresented, when he is no longer able to explain what he meant, must, in general, render such declarations of little value as evidence. But they are sometimes received to explain a latent ambiguity, or to ascertain the intention of the testator, in case of doubts arising from an equivocal act; and the uniform practice of the English testimentary Courts, has been to receive such declarations, to strengthen or repel the presumption, that a will once legally executed, but not found at the death of the testator, (or canceled) had been destroyed by him.

This question came before Judge Story, in Smith vs. Fenner, (1 Gall. Reports, 169), who held that the declarations of the testator, before and after the time of making a will, (or revoking one), and, afterwards, if so made as to be a part of the *res gestæ*, are admissible to show fraud in obtaining the will, but not declarations at any distance of time after the will has been executed, especially where the will has always

been in the testator's possession. (See, also, 2 Mass. Rep., 507, and other cases to the same effect). The cases of Jackson and Kniffin, in 2 Johnson, and Smith and Fenner, 1 Gall., are considered the leading authorities to sustain the view held by the circuit Judge upon the question under consideration.

Then, on the other side, we have Batey vs. Holman, executor of Batey, (3 Hem. and Munf., 502), where, notwithstanding the Judges differed upon other points, they unanimously held that *parol* evidence was admissible to show the situation of the testator and the *quo animo*, the cancellation was made. The Virginia cases are numerous upon this point. Cogbill vs. Cogbill, 2 Hen. and Munf. 467; Temple and Taylor against Temple, 1 Hen. and Munf., 478, and Zerby vs. Zerby, (3 Call., 334), are all strong precedents to the same effect.

In 1821, fifteen years after Jackson, *ex dem.*, Coe vs. Kniffin, and nine years after Smith and Fenner, which, as before intimated, are the leading cases against this sort of evidence, the question involved in these cases was presented to the Supreme Court of North Carolina, who expressly adopted the opinions of Spencer and Tompkins, Js., in the first case, thus repudiating the decisions of both the Supreme Court of New York and of Judge Story. Both these cases, say Messrs. Cowen and Hill, (in note 194, p. 301, 3d volume of Phillips in Evidence), were before them, appear to have been sometimes in the hands of counsel, and were followed by the Judge at *nisi prius*. At the bar, great research and high forensic talent were exhibited in the discussion, both upon principle and authority; the main ground for the evidence being the admitted one, that declarations made by the owner follow from him to all who claim under him, along with descents, devises and sales. The evidence proposed was of repeated declarations made *after* the execution of the will, and consisted in stating its contents to be materially and utterly different from what they were. They were offered in connection with conflicting testimony upon the part of testamentary capacity. The evidence was resisted, as in New

York, among other arguments, on the ground that it would violate the spirit of the North Carolina Statute of Revocations, which also required (as the British statute) certain specified solemnities.

On both sides, the English authorities, *then 'extant*, were fully cited and applied. On the whole, say the compilers, the arguments were learned and useful, and must have saved the Judges great labor upon this vexed controversy. The conclusion of the Court is thus strongly expressed:

" To reject the declarations of the only person having a vested interest, and who was interested to declare the truth— whose fiat gave existence to the will, and whose fiat could destroy, and, in doing the one or the other, could interfere with the rights of no one, involves almost an absurdity; and (with due deference to the opinions of those who have decided to the contrary) we say—and not upon the ground of their being part of the *res gestæ*—for whether they accompany the act or not, whether made long before, or long after, the making of the will, is entirely immaterial as to their competency. Those circumstances only go to their weight or credit with the tribunal who is to try the fact." After a further examination of the question, they add : " For these reasons, and those given by Judge Spencer, who, together with Judge Tompkins, dissented from the opinion of the Court, and because of the doubt which rested, for some time, on Judge Livingston's mind, we think we are bound to disregard the opinion of the majority of the Court, in 2 Johns. 31, and also the case in 1 Gall., 170."—(Reels, executors, vs. Reel, 1 Hawks, 247, 268–'9.)

Again, in 1832, on the trial of an issue of *divisavet vel non*, Judge Martin, at *nisi prius*, rejected the testator's declarations, made after the execution of the will. On moving for a new trial, the question was treated as open and unincluded in Reels vs. Reel, because there the testator died before the North Carolina statute of revocation passed, which was not till 1817. The statute being before the former decision, though after the will was made—a distinction not adverted to. Provis & Reed, 5 Bingham, was now cited by

counsel, in addition to Jackson vs. Kniffin and Smith & Fenner, as an authority for excluding the proof. The Court declared that they had "deliberately considered the question anew"; "that the proof offered was relevant to the point." The assertion that it may mislead the jury, is applicable to all evidence submitted to them. This is incident to our tribunals as constituted; and not peculiar to this species of evidence.

It is said that the reasons for not hearing *parol* proof is, that there is not the ordinary security that it is true. This goes to the weight of the evidence. It is true, there are many cases in which it would be entitled to but little weight; nay, but a few in which it would be entitled to any. Yet, if there be others, in which it would subserve the cause of truth and justice, it must be heard, leaving its effects to those whose province it is to weigh it. I think there is little danger in this, when the Court can aid the jury in pointing out its legitimate tendency."

I forbear to make further quotations from this "perspicuous and masterly" opinion of Judge Ruffin. I would gladly incorporate it entire, but must content myself by referring to it as demonstrating conclusively, to my mind, the propriety, as well as safety, in receiving such evidence.

Having thus, as briefly as I could, adverted to the conflicting decisions upon this vexed question, James Kent and Joseph Story, men unsurpassed for legal learning, being arrayed against Ambrose Spencer and Thomas Ruffin, to say nothing of Spencer Roane, than whom abler common law Judges never presided in the Courts of this country, and differing, as I do, from a worthy brother and associate, for whom and for whose opinions, I have the highest respect, I must say, that I have not a *scintilla* of doubt resting in my mind that the testimony excluded should have been received by the Circuit Court.

Judgment reversed.