SOUTHWICK, Ex parte. See Case No. 18,063.

SOUTHWICK (CLARKE v.). See Case No. 2,863.

## Case No. 13,194.

SOUTHWORTH v. ADAMS et al.

[11 Biss. 256.] [1]

Circuit Court, E. D. Wisconsin. May, 1882.

SECONDARY EVIDENCE ADMISSIBLE TO ESTABLISH LOST WILL—DECLARATIONS OF TESTATOR—CHARACTER OF EVIDENCE NECESSARY—LOST WILL—PRESUMPTION OF DESTRUCTION BY TESTATOR—EVIDENCE—WEIGHT OF TESTIMONY.

1. In a suit to establish a lost will, secondary evidence of the existence and contents of the will is admissible; and the declarations of the testator concerning the will may be shown, as well to establish its contents, as to show the probability or improbability of its destruction by him.

2. The burden is on a party setting up a lost will to prove its execution and contents by strong, positive and convincing evidence.

3. Where it is proved that a will was made, and the testator thereafter had custody of it, if it cannot be found after his death the presumption is that he destroyed it animo cancellandi; but such presumption is not conclusive, and may be rebutted and overthrown by circumstantial proof.

[Cited in Re Ladd's Will, 60 Wis. 199, 18 N. W. 740.]

4. To justify a settled belief that the statements of a witness are willfully fabricated, the court should not rest its judgment upon possibilities, but there should be strong circumstances and tangible facts plainly pointing to such a conclusion.

5. The court, after a full and exhaustive review of the extended facts and circumstances of this case, holds that the testator did not destroy his will animo cancellandi, but that it was accidentally lost from his possession shortly before his death, and should be established.

In equity. Bill to establish a lost will by Sarah Southworth against Jane N. Adams and others. Decree for complainant.

For former report, see 4 Fed. 1.

This was a suit in equity, brought originally in the state court, and duly removed to this court, to establish an alleged lost will of Richard De Forest, deceased. A statute of the state of Wisconsin, in force when the action was commenced, provided that "whenever any will of real or personal estate shall be lost or destroyed, by accident or design, the circuit court shall have the same power to take proof of the execution and validity of such will, and to establish the same, as in the case of lost deeds." And the action, when commenced, was one authorized by this statutory provi-

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

sion, which, however, has since been somewhat changed.

In order to obtain a correct understanding of the situation of the deceased at the time of making the alleged will, and of the relations which during his life the parties in interest bore to the testator and to each other, reference to certain leading facts is necessary. During most of the years of 1876 and 1877, Richard De Forest was a resident of Whitewater, Wis. He had previously resided in Rochester, N. Y., where, in 1853, he contracted a second marriage. His wife at that time was the mother, by a previous marriage, of two daughters, one of whom was then nearly 17 years of age, and is now the wife of Rev. E. Southworth, and is the complainant in this case. The other daughter at the time of her mother's marriage to Mr. De Forest was nearly 11 years of age, and is the wife of the defendant James M. Case. Mrs. Case was married in 1865, and Mrs. Southworth in 1866, and from 1853 to the time of their respective marriages their home was with their mother and stepfather in Rochester. At the time of his second marriage, Mr. De Forest had a daughter, Mrs. Jane N. Adams, then and now the wife of Walter E. Adams, and who is the sole heir at law of her father, and the principal defendant herein. Mr. and Mrs. Adams reside in Detroit, Mich., and have long resided there. At the time of the death of Mr. De Forest both Mrs. Southworth and Mrs. Case resided in Whitewater, Wis. The property constituting the homestead of Mr. and Mrs. De Forest in Rochester was acquired and mostly paid for by Mr. De Forest at a cost, including improvements, of about $5,000, and on its purchase he caused the title to be taken in the name of his wife. Mrs. De Forest died in 1876. The Rochester home was then broken up, and thereafter, during most of the time until his death, which occurred November 20, 1877, he lived with his stepdaughter Mrs. Case, at Whitewater. He had been in active life a clergyman, but was now retired from his profession, and was shown to have been a man of reserved manners and of reticent habit in speech. After the death of his wife, he sold the Rochester homestead for $8,000, and the proceeds of the sale were divided between himself, Mrs. Southworth, and Mrs. Case, each receiving one third. In May, 1876, and after he had established a residence in Whitewater, he made a will, which, however, was subsequently destroyed, and the contents of which were not disclosed by the proofs. The attorney who drew that will testified that he thought he drew for Mr. De Forest a second will, which was also afterwards destroyed. It was claimed in behalf of the complainant that in June, 1877, Mr. De Forest made still another will of the following tenor and effect:

"In the name of God, Amen. I, Richard

De Forest. of the town and village of White-water, Walworth county, and state of Wisconsin, and being of sound mind and memory, for which I thank His holy name, and being seventy-four years of age, do make, publish, and declare this my last will and testament in manner following, that is to say: First. It is my will that all of my just debts and funeral expenses should be paid as soon after my decease as may be. Second. I do hereby give and devise unto my daughter, Jane N. Adams, the interest on $3,000 for and during her life, and at her death I do hereby give and devise the same, said $3,000, to my two grandsons, Romain De Forest Adams and John P. Adams, to be divided equally between them, share and share alike. Third. I do hereby give and devise unto my stepdaughter Mrs. Ellen S. Case, wife of James M. Case, the sum of $300. Fourth. I do hereby give and devise unto my stepdaughter Mrs. Sarah Southworth, wife of Rev. E. Southworth, the sum of $300. Fifth. I do hereby give and devise unto my namesake Charles De Forest Case, son of James M. and Ellen S. Case, the sum of $200 and my gold watch and chain. Sixth. I do hereby give and devise unto my namesake Chester De Forest Southworth, son of Rev. E. and Sarah Southworth, the sum of three hundred dollars. Seventh. I do hereby give and devise unto my grandsons, Romain De Forest Adams and John P. Adams, the sum of four hundred dollars each. Eighth. I do hereby give and devise unto the American Bible Society of Astor Place, New York, the sum of five hundred dollars. Ninth. I do hereby give, devise, and bequeath unto Mrs. Sarah Southworth, wife of Rev. E. Southworth, all the rest and residue of my property, that I may die seised or possessed of, both real and personal, and to her heirs and assigns forever. Tenth. I do hereby nominate and appoint James M. Case, of Whitewater, Wisconsin, the executor of this my last will and testament, hereby revoking all former wills by me made. In witness whereof, I have hereunto set my hand and seal this (some day in June) A. D. 1877. Richard De Forest. (Seal.)

"The above instrument, consisting of one sheet of legal cap paper, was, at the date thereof, signed, sealed, published, and declared by the said Richard De Forest as and for his last will and testament, in presence of us, who, at his request and in his presence, and in the presence of each other, have subscribed our names as witnesses thereto. J. H. Page, Whitewater, Wisconsin. George S. Marsh, Whitewater, Wisconsin."

Page & Bishop and James G. Jenkins, for complainant.

Weeks & Steele and W. M. Lillibridge, for defendant Jane N. Adams.

DYER, District Judge. Upon the facts as developed by the proofs several questions arise: First, can secondary evidence be given of the contents of the alleged will? secondly, if so, is the evidence of the execution, contents, and existence of the will adequate? and, thirdly, if the will is duly proven, since it was not found after the death of the testator, was it or not destroyed by him animo revocandi?

1. In this class of cases it was at one time somewhat questioned whether secondary evidence of the existence and contents of a will is admissible, and whether the declarations of the testator concerning the will may be shown, to establish its contents and the probability or improbability of its destruction by him. It is now, however, fully settled, both in England and in this country, that such declarations are admissible, and that secondary evidence may be resorted to for the purpose stated. Colvin v. Fraser, 2 Hagg. Ecc. 266; Sugden v. Lord St. Leonards, 17 Moak, Eng. R. 453; Weeks v. McBeth, 14 Ala. 474; Patterson v. Hickey, 32 Ga. 156, and Betts v. Jackson, 6 Wend. 173.

2. Counsel for the defendant Mrs. Adams dispute the genuineness of the alleged will, or rather deny that adequate proof is made of its contents. The rule is well established that the burden is on a party setting up a lost will to prove its execution and contents by strong, positive, and convincing evidence. Newell v. Homer, 120 Mass. 280. The execution and contents of the will in question are, in my opinion, satisfactorily proved. The attorney who drew the will and witnessed its execution testified upon the subject positively and circumstantially. Another witness of unquestioned character testified that at the time when the will is alleged to have been executed he was called to the attorney's office to witness its execution; that Mr. De Forest duly executed it in his presence, and requested him to sign it as a witness, and that he put his signature thereto as such witness. It is true that the age of Mr. De Forest is stated in the copy of the will now produced to have been 74 years, when in fact he was then 75 years old; and it is also true that the contents of the will are stated by the attorney from memory; but, notwithstanding the error in the statement of the testator's age, and the necessary dependence upon recollection in giving the contents of the will, I cannot reasonably doubt, in the face of all the other facts and circumstances proven, that the will was executed, as claimed by the complainant. The attorney appears to have been aided in his recollection of its contents by reference to a form book containing the form of a will, which he says he uniformly used in drawing wills similar in general form and character to this. Mr. De Forest subsequently exhibited the document, and, as will fully appear when another branch of the case is considered, made declarations to the effect that it was his will. Before the will was drawn he prepared a memorandum in pencil of the different bequests he desired to

make, and it is shown that the will was drawn mainly under his dictation, with the memorandum before him. This paper was found after his death, and, as to amounts and names of legatees, corresponds with the copy of the will now produced, except that the memorandum makes no mention of a residuary bequest in favor of Mrs. Southworth. It is true that a copy of the will was made after the memorandum was found, but the fact of the existence of the memorandum strongly corroborates the claim that a will was drawn and executed; and, as the will is simple in its provisions, and as the memory of the attorney was aided by the memorandum in the handwriting of the deceased, and by such circumstances as are proven to have existed in connection with the transaction, it would seem not to have been very difficult for him to recall the essential parts of the instrument. In Sugden v. Lord St. Leonards, supra, it was held that the contents of a lost will may be proved by the evidence of a single witness, though interested, whose veracity and competency are unimpeached; and in that case the principal testimony upon which a very complicated will was established was that of one witness, who was a beneficiary under the will. Without discussing at length the testimony bearing on this question, I hold without hesitation that the execution and contents of the alleged will are sufficiently proved, and I may add that I regard this the least difficult question of fact in the case.

3. The remaining and more serious question is, can the will, under the proofs in the case, be established as a lost instrument, and be held operative as a continuing testamentary disposition, or must the conclusion be that it was destroyed by the testator animo revocandi? The problem here presented is one not free from serious difficulty, since the facts which support the opposing claims of the parties stand in strong array against each other. The principle of law involved is a very simple one, namely, that where a will is proved to have been made, and the testator thereafter had the custody of it, if after his death it cannot be found, the presumption is that he destroyed it animo cancellandi. The courts have differed somewhat in relation to the precise nature of this presumption. Whether, properly speaking, it be of law or of fact, it is well settled that the presumption is not conclusive, but may be rebutted and overthrown. In Brown v. Brown, 8 El. & Bl. 886, Lord Campbell said: "After execution, the will was delivered to the testator, and it is never seen in any other custody. The testator said he should take it to his bankers, but he never did so, and on his death, though it has been searched for, it has not been found. It must therefore be considered as destroyed, and I think the presumption is that the testator destroyed it. That is a reasonable presumption, as he had the last custody of it, and it is not forthcoming. Whether this is a presumption of fact or

a presumption of law, liable to be rebutted, is not material. These facts give rise to a presumption shifting the onus of proof. As early as 1754, in Helyar v. Helyar, Lee, Ecc. 472, we find a great judge, Sir George Lee, laying down these principles and acting on them, nor have they ever been doubted since. In Welch v. Phillips, 1 Moore, P. C. 299, another very great judge, the present Lord Wensleydale, lays down the principle that this is a presumption of fact to prevail unless rebutted, and the same doctrine is laid down in Cutto v. Gilbert, 9 Moore, P. C. 131, by another great judge, Dr. Lushington, than whom no one has had more experience in such cases." Crompton, J., in a concurring opinion, said: "The main question is whether the second will was destroyed by the testator animo cancellandi. The cases cited establish what the course of evidence is. Frequently a state of facts shifts the burden of proof from one side to the other. For instance, in the case of a bill of exchange, the presumption is that the holder gave value for it till evidence may be given by the other side that shifts the onus and calls on him to prove value. Such cases are not presumptions of law which cannot be rebutted, but instances of the course of evidence shifting the burden of proof."

In Loxley v. Jackson, 3 Phillim. Ecc. 126, it was held by Sir John Nicholl that "when a will is not found on the death of a testator, the presumption of law is that it has been destroyed by him."

In Colvin v. Fraser, 2 Hagg. Ecc. 266, it was held as follows: "A will being executed in duplicate, one part of which was proved to have been in, and was never traced out of, the deceased's possession, and was not found at his death, the prima facie presumptions are —First, that the testator destroyed the part in his own possession; and, second, (if the first is not repelled,) that he intended thereby to revoke the duplicate not in his possession." In the opinion in this case, which is very instructive, the learned judge says, (page 325:) "This presumption of fact and this legal consequence may be rebutted by satisfactory evidence, but the burden of proof lies upon the party setting up the will, whether he sets it up by propounding a draft, a duplicate, or a canceled will; for, whether the paper be found canceled, or whether it be wholly removed and not found at all, still the first presumption, as to the person who did the act, is the same. The force of the presumption and the weight of the onus may be different, according to circumstances; but the court, in order to pronounce for a draft, or a duplicate, or a canceled will, must be judicially convinced that the absence or cancellation of the paper, once in, and not traced out of, the deceased's own possession, was not attributable to the deceased. This negative may be established by a strong combination of circumstances, leading to a moral conviction that the deceased did not do the act;

or it may be established by direct positive evidence in different ways,—such as by proving the existence of the instrument after the testator's death, by proving that he himself destroyed it when of unsound mind, or by error, or under force sine animo revocandi. * * * All these presumptions, if they come to be analyzed, may be resolved into the reasonable probability of fact deduced from the ordinary practice of mankind and from sound reason. Persons in general keep their wills in places of safety, or, as we here technically express it, 'among their papers of moment and concern.' They are instruments in their nature revocable. Testamentary intention is ambulatory till death, and, if the instrument be not found in the repositories of the testator where he had placed it, the common sense of the matter prima facie is that he himself destroyed it, meaning to revoke it."

In Sugden v. Lord St. Leonards, 17 Moak, Eng. R. 511, which is the leading modern will case in England, Cockburn, C. J., stated the principle in this form: "Where a will is shown to have been in the custody of a testator, and is not found at his death, the well-known presumption arises that the will has been destroyed by the testator for the purpose of revoking it; but of course that presumption may be rebutted by the facts. Although presumptio juris, it is not presumptio de jure, and of course the presumption will be more or less strong, according to the character of the custody which the testator had over the will."

In the same case, Jessel, master of the rolls, said, (page 523:) "If you trace the will to the possession of the testator, and it is not forthcoming at his decease, and there is no evidence to . how what has become of it, that raises a sufficient presumption of law that he destroyed it with the intention of revocation; but, like all other presumptions of law, it may be rebutted by sufficient evidence."

In Betts v. Jackson, 6 Wend. 173, it was held by Chancellor Walworth, on full review of the English cases, that where a will was duly executed, and in the custody of the testator for five years afterwards, and within ten months previous to his decease, but could not be found after his decease, that the legal presumption was that the testator had destroyed it animo revocandi.

In the case of Idley v. Bowen, 11 Wend. 227, it was held that "a will duly executed, destroyed in the lifetime of the testator, without his authority, may be established upon satisfactory evidence of its contents, and of its having been so destroyed. 'The presumption of law is that a will proved to have had existence, and not found at the death of the testator, was destroyed animo revocandi; but a party seeking to establish such will may repel such presumption, and show that it was improperly destroyed."

So in the case of Holland v. Ferris, 2 Bradf. Sur. 334, it was said: "If a will proved to have been executed and to have been in the possession of the decedent cannot be traced to the custody of another, or cannot be found, the presumption of law is that it has been destroyed animo revocandi."

But in Legare v. Ashe, 1 Bay, 464, the view of the court was that the nonproduction of a will is only a prima facie presumption that it was canceled, and not a legal conclusion; and in Durant v. Ashmore, 2 Rich. Law, 192, the court use this language in the opinion: "The court below stated this general proposition: that where a testator had taken charge of his own will, and it could not be found among his papers after his death, the presumption of law was that he had voluntarily destroyed it for the purpose of revocation; that it was a mere presumption, however, and might be rebutted by circumstances going to show that the will had been destroyed after his death. That this in words was a little stronger than I think correct is true, but I have no doubt the judge really intended no more than the very position which I maintain. Still, in a case like this, where the merest trifle may have produced the verdict, I think it necessary to qualify the proposition stated. That after the execution of a will has been duly proved it can only be destroyed by showing another will revoking it, or by expressly proving burning or cancellation, is plainly and very properly declared not to be law by Colvin v. Fraser, 4 Eng. Ecc. R. 113, Lillie v. Lillie, 5 Eng. Ecc. R. 67, and the well-considered judgment of the court of errors of the state of New York, in the case of Betts v. Jackson, 6 Wend. 173, overruling the same case, decided in the supreme court under the title of Jackson v. Betts, 9 Cow. 208. That a presumption of revocation arises from the fact that the will is not found is beyond all doubt, and is fully sustained by the cases cited. But I maintain that this is not a presumption of law; it is a presumption of fact merely, and that, I have no doubt, was the idea of the judge below, although he called it a presumption of law, as is often done by the judges in the cases referred to; for he said it might be rebutted by facts showing the existence of the will. Judge Waties struck the true idea in the case of Legare v. Ashe, 1 Bay, 465, when he said: 'The nonproduction of it (the will) is only a prima facie presumption that it was canceled, and not a legal conclusion.' "

In Re Johnson's Will, 40 Conn. 588, it was said:

"The mere absence of the will raises a presumption that it was revoked. Whether that presumption is one of law or of fact is perhaps immaterial, as in either case it must be rebutted by proof. Evidence for that purpose may be direct or circumstantial."

See, also, as asserting the same rule, Davis v. Sigourney, 8 Metc. (Mass.) 487; Newell v. Homes, 120 Mass. 280; Appling v. Eades, 1 Grat. 286; Weeks v. McBeth, 14 Ala. 474; McBeth v. McBeth, 11 Ala. 596; and Daw-

son v. Smith, 3 Houst. 335. In Minkler v. Minkler, 14 Vt. 125, Judge Redfield held that if a testator executes his will, and the will is not to be found at the time of his decease, this raises a presumption of his having destroyed it with intent to revoke it. But this is a presumption of fact merely which may be encountered by contrary proof, and the will thus established.

Whether, therefore, the presumption in such a case be one of law or of fact, it is fully settled, by both the English and American authorities on the subject, that the presumption may be rebutted by proof on the part of the proponents of the will, upon whom the burden rests to show that the will was not destroyed by the testator with an intention to revoke it; so that in the end it really becomes a question of fact for the court or the jury to determine, and in the determination of the question the whole evidence must be looked into.

Recurring, then, to the facts, which are of singular interest, it may be again remarked that the will in question was made in June, 1877. The testator died on the 20th day of November of the same year, under circumstances which will be hereafter stated. After the will was finished in all details of execution, the attorney placed it in an unsealed envelope, which he labeled, "Last will and testament of Richard De Forest," and delivered it to the testator, who then left the attorney's office, taking the will with him. There cannot be much doubt that he took the will to the house of Mr. and Mrs. Case, which was his home. It appears that when he came there to live in April, 1876, he brought with him two trunks, one of which is described as a leather-covered trunk, and the other as a black trunk. The leather-covered trunk was kept in the storeroom of the house, and usually contained articles of clothing that he did not use and some of his books. The black trunk was kept in his sleeping room, and generally contained clothing, books, papers, and such other articles as he did not keep in a bureau, of which he had the use, or in other parts of the room. He had also a small tin trunk, in which he kept what he regarded his most valuable papers, and this tin trunk was sometimes kept in a locked drawer of the bureau, and sometimes in the black trunk. Whether he placed the will, immediately after its execution, in the tin trunk or in the black trunk, or in the bureau drawer,—if he deposited it in either of those places,—is not known. It does not clearly appear that he immediately communicated to Mrs. Case, or any of her household, the fact that he had made a will, but the existence and his continued possession of the will to a time as late as October is satisfactorily proved.

The witness Leland, who is a physician in Whitewater, testifies that in June, 1877, Mr. De Forest came into his office to pay a bill, and there remarked, in substance, that he had been to a lawyer's office "with reference to his will." In view of the nature of the remark, and the time when the witness fixes the occurrence,—between June 1st and 15th,—it is quite apparent that the remark was made immediately or very soon after the will was drawn.

The witness Fay testifies that, in the course of a street conversation, Mr. De Forest said to him, in substance, this: "Your father is remarkably healthy for a man of his age. I almost wished I had fixed my property as your father has his; that is, so that when I die that will be the end of it; it will all be closed; but I have made provisions for Mrs. Southworth. She has been unfortunate, for she has married a minister, and you know they are always poor. My daughter has had as much or more than I can give the rest of them."

Mr. Page, the attorney who drew the will, testifies that about two or three months after the will was drawn, Mr. De Forest called at his office, and inquired about a proper place to deposit a will, and witness told him that "some people sent wills to the county judge for him to keep for them, and some left them with the attorney who drew the will, and some delivered them to the executor named in the will;" and he thinks he also told him that some persons left their wills with a friend. At this time Mr. Page swears that Mr. De Forest took the will out of his pocket, and put it back there at the close of the interview; that he did not then see the will itself, but saw the envelope, and noticed the filing thereon.

Mrs. Ellen S. Case testifies that he occasionally looked over his papers; that she has seen him take them from the tin trunk for that purpose; that at one time he exhibited to her his will, in the presence of her husband, and that she read it, but she is unable to fix the time, or to say whether or not the tin trunk was present on that occasion. Mr. Case states that in May, 1876, Mr. De Forest handed to Mrs. Case, a will and told her to read it. If this be so, the will then shown must have been the instrument which Page swears he first drew, and which was afterwards destroyed. Mr. Case then further states that in June, 1877, he saw a paper purporting to be the will of Mr. De Forest. His testimony in that connection is as follows: "My wife was present, and took the will from the hands of Father De Forest. She read the will at his request. He asked her how she liked it. I think she told him if he was suited with it, she was. He said it just suited him, and he never should change it again. He asked me what I thought about it. I heard it read,— heard my wife read it. I told him I thought he might have bettered it in one place, and that was by selecting a better man for executor. He says, 'You will do as well as you can, won't you?' I told him I would. He said that was all any one could do. I think that was all that was said at the time about the will."

The witness testifies further that he thinks Mr. De Forest took the will at that time from his coat pocket, and that he also thinks that after it had been read it was placed in the tin trunk; but of this he evidently is not certain. Mr. Case also testifies that in October, 1877, as near as he can recollect, he saw Mr. De Forest in the sitting room of the house, with the tin trunk in his lap, looking over his papers; that he then saw the will and the envelope in the hands of Mr. De Forest, the will being out of the envelope, but he does not know what was done with the will, nor did he ever see it afterwards.

Mr. De Forest left Whitewater on the 20th day of November, 1877. A short time before that he announced to the family of Mr. Case and to some other friends his intention to go to Brooklyn, N. Y., stating, in substance, as a reason for leaving, that the winter climate in Wisconsin was too rigorous for him. Shortly before his departure his black trunk was packed by Mrs. Southworth and Mrs. Case. The articles placed in the trunk included his clothing, books, papers, sermons, a satchel, and the small tin trunk, which was locked. The testimony does not clearly show whether the articles packed in the trunk comprised all of his effects or not, but the trunk was full, and the small tin trunk was placed at the bottom, so that the other contents of the trunk were over it. The testimony is that Mr. De Forest remarked at the time, in the presence of Mrs. Southworth and Mrs. Case, that he wished to have the tin trunk packed carefully, as he had important papers in it. It is also proved that, after the large trunk was made ready for removal to the depot, it was securely locked and strapped. On the morning of November 20th a teamster by the name of Chadderdon took Mr. De Forest, Mr. Case, and the trunk to the depot. As Mr. De Forest intended to stop at Detroit, where his daughter resided, he purchased a ticket to New York via the Michigan Central Railroad, but his trunk was checked, probably by mistake, over the Lake Shore & Michigan Southern road. The mistake, however, if it was such, was not then noticed, and he took the check. As the trains ran at that time, Mr. De Forest arrived in Milwaukee at 11 o'clock a. m. of November 20th, and left for Chicago at 1 o'clock p. m., arriving at that city at 4 o'clock, and there is proof that his trunk accompanied him on those trains. On arrival in Chicago, the trunk was taken to the road over which it was checked, and Mr. De Forest proceeded to the house of W. H. Ovington, whose wife was a sister of Mrs. De Forest, deceased, and there he expected to spend the night, and to resume the journey on the following morning. On reaching the house, he almost instantly died. On his person were found certificates of stock and indebtedness of the West Division Railway of Chicago, amounting in value to several thousand dollars, two portemonnaies, and a purse containing about $150 in money, a letter of dismissal and recommendation from the Congregational Church of Whitewater to a Congregational Church in Brooklyn, a photograph of his deceased wife, his railroad tickets, and in one of his portemonnaies were his trunk check and key, and also a key of the small tin trunk. He had brought with him, in addition, a satchel, which contained articles of clothing, but his will was neither on his person nor in the satchel. Mr. Case was immediately notified of the death of Mr. De Forest, and he and his wife arrived in Chicago on the morning of the 21st. On that day Mr. Case informed Mr. and Mrs. Adams by telegraph of the death of Mr. De Forest, stating that he should leave for Rochester with the body on Thursday, the 22d, via the Michigan Central Railroad, and asked the Adamses to accompany him to Rochester to attend the burial services. On the evening of the 22d Mr. Case left Chicago with the body of the deceased, and on the following morning met Mr. and Mrs. Adams on the train at or near Detroit, and they proceeded together to Rochester to attend the burial, which occurred on Saturday, November 24th. Mr. and Mrs. Adams returned to Detroit, and Mr. Case returned to Chicago at about the same time. Meantime, Ovington, by dispatch to the baggage agent at Buffalo, had intercepted the trunk at that place, and it was immediately returned to him, and was in his possession on the arrival of Case from Rochester. The trunk was found to be strapped, apparently as when it left Whitewater, but the hasp of the lock was broken or severed from the top of the trunk. The contents were in some disorder, but, according to the testimony of the witnesses Ovington and Blodgett, not more so than the handling of the trunk while in transit would occasion. The small tin trunk was in its place at the bottom of the large trunk, securely locked. It was opened, and found to contain various papers, including the envelope in which the will was originally placed by the attorney, Page, with the filing thereon, "Last will and testament of Richard De Forest," but the will was not in the envelope, nor was it found either in the tin trunk or in the large trunk. The witness Ovington testified that some loose papers were lying in the large trunk near the place where the tin trunk stood, and it appears that the memorandum before referred to in Mr. De Forest's handwriting, which was used by him when the will was drawn, was found among these papers after the return of the trunk to Whitewater. The body of the deceased was soon afterward exhumed, and further examination of the clothing made, but the will was not found, and, after prolonged search in all places where it has been thought possible to find it, it has never been discovered.

From all the testimony, it is quite apparent that the last time the will was ever seen by any person other than Mr. De Forest was in October, 1877, about a month before he died, when Mr. Case testifies the deceased was

looking over his papers, and had the will in his hand. The question now is, must the presumption that the testator destroyed the will be held to prevail, or is that presumption overcome by the proven facts and ·circumstances of the case? It can hardly be questioned, I think, that Mr. De Forest, by his outward acts, manifested a strong desire to make a testamentary disposition of his property, and not to die intestate. The very specific designation of the bequests he wished to make, as shown in the memorandum prepared by himself, and which really constituted the basis of the will as finally drawn, the personal directions he gave and care he exercised when the will was put in form, his previous execution of a will, which he now wished to change, his subsequent declarations that the will drawn in June, 1877, suited him, and that he should never change it, his evident desire to provide for Mrs. Southworth, as evidenced by his remark to the witness Fay, his inquiries in relation to a place where the will might be properly deposited for safe-keeping, made several months after the will was drawn, are all circumstances which point to a well-matured intention to make a final testamentary disposition of his property. There is no proof of any expressions by him of dissatisfaction with the will subsequent to the time when he declared that he should never change it; and, in view of all the circumstances existing both before and after the death of his wife, it is not difficult to believe that he naturally desired, in the final distribution of his estate, to bestow it in the manner expressed in the will. He certainly intended at the time he executed the will thus to dispose of his property, and there is no affirmative evidence that he afterwards changed his mind. He was an old man. He knew that he had not many years of life before him. It is quite evident that he had been devotedly attached to his wife. Her children had grown to womanhood under his parental care, and it was most natural that he should be drawn to them by ties of strong affection, especially after the death of their mother, while at the same time his affection for his own daughter and her offspring suffered no abatement.

It was argued by the learned counsel for the defendant Mrs. Adams that Mr. De Forest's departure from Whitewater was probably occasioned by family disagreements, which were hidden from public view, and have never been revealed. There is no testimony that lends support to even a conjecture of that character. There is no proof whatever that furnishes ground for even a suspicion of any severance of the domestic connection between the deceased and either of his stepdaughters or their families. It is in proof that he cherished both for Mrs. Southworth and Mrs. Case the kindliest feelings, spoke of them in affectionate terms, as if they were his own children, and of his home with them as one of comfort, and it is also shown that this feeling was reciprocated by them, and that they uniformly addressed him as if he were their own father. One of the witnesses testifies that Mr. De Forest often spoke of Mrs. Southworth in connection with Mrs. Case. He said: "They were like his own children to him; they had done for him what no one else could do but their mother. In speaking of his home being broken up, and being left alone, it was the greatest comfort he could have was a home with them; that they had done everything for him, and seemed as willing to do for him as though he were their own father."

It is at the same time apparent that Mr. De Forest's parental affection and regard for his own daughter, Mrs. Adams, was steadily maintained. There is some testimony which indicates that there had once been business relations between Mr. De Forest and Mr. Adams, which involved the former in some pecuniary losses and which were therefore unsatisfactory, and there appears to be some ground for the belief that his feelings towards his son-in-law were not those of entire confidence and satisfaction. It is shown, however, that on one or more occasions Mrs. Adams was the recipient of presents from her father, and it appears that in August, 1876, he went from Whitewater to Detroit to attend the marriage of one of his grandsons, and at that time procured his life to be insured in the sum of $2,000 for the benefit of Mrs. Adams, who, it is understood, received the avails of the insurance after her father's death. The witness to whose testimony reference has just been made further testifies to a conversation she had with Mr. De Forest a short time before he went to the wedding of his grandson, in which he said that he had "spared no money in educating his daughter; that he had done a great deal for her in many ways, but that she would never be able to do anything for him"; that "on account of his grandson he should go to the wedding, although it was no comfort for him to go there." The attorney who drew the will also testifies that Mr. De Forest directed him to omit the name of Mr. Adams from the will, but to insert the names of Mr. Case and Mr. Southworth as the respective husbands of the legatees Mrs. Case and Mrs. Southworth, and it is observable that in the pencil memorandum in the testator's handwriting, before referred to, the name of Mr. Adams does not appear, and that the names of Mr. Case and Mr. Southworth are written therein in conjunction with the names of their wives. Too much stress, however, is not to be laid on this circumstance, for the reason that Mrs. Adams is mentioned in the memorandum as his daughter, and he may not, therefore, have thought it necessary to insert therein the name of her husband for further description; and, as Mrs. Case and Mrs. Southworth were not of blood kin to him, he may have deemed it important to name their husbands in that

connection, for the purpose of full identification.

In support of the claim that Mr. De Forest's departure from Whitewater was occasioned by family dissensions, it is urged that his whole conduct indicated an intention not to return. The testimony does not support this conclusion. On the contrary, the weight of the evidence is that he left only because of the severity of the winter climate in Wisconsin. Allusions that from time to time he made to his health very clearly show this to have been the fact. On one occasion he remarked that he was going east on a visit, at another time he said he should remain away until spring, and on other occasions he said nothing of the length of time he should be absent. In September previous he stated to a friend in Chicago that he should not stay in Whitewater long; the winters were too severe for him. To another witness he remarked that "he was going east on account of his neuralgia; that if he was not better there he should return. Mr. Case made it very pleasant for him here, but that on account of the severe weather it made his trouble worse"; and in a conversation with Rev. G. W. Wells in relation to his proposed departure, he said that he had settled matters for this life and the life to come.

It is contended further on the part of the defense that there is affirmative proof that a few days before the deceased left Whitewater he destroyed the will. In support of this theory the testimony of Mrs. Lucinda Case, the mother of James M. Case, is relied on. She was an aged lady, whose home was with her son, and she testified that on the Friday before Mr. De Forest went away, which was November 16th, he was writing at a desk in her son's room; that she was sitting in the kitchen, where there had been a fire; that "he came in after he got through writing, and he had a paper in his hand. He took off the cover to the kitchen stove. * * * He had a paper in his hand that he twisted around; he poked up the coals and put it on the coals, and put the cover on." She described the paper burned as white writing paper, "twisted around the middle and the ends stuck out," and says that when he burned the paper he said nothing, and at once went out of the room. From the circumstances under which this act was done, especially when considered in connection with the fact that he was already preparing to go away, it is strongly contended that the paper Mr. De Forest then burned was the will in question. I do not think this conclusion is maintainable upon the testimony. In the first place it seems highly improbable that he would thus destroy the will in the presence of an inmate of the house. So far as the proofs show, he had given no signs of an intention to revoke or destroy it, and, if he had secretly resolved to destroy it, it would have been natural for him to make the act of de-

struction as secret as the thought which prompted the act. But it appears, further, that on the day when he burned the paper, November 16th, he wrote a note in pencil to Mr. and Mrs. Adams, stating that he hoped to arrive at their house on the 21st inst.; that he was as well as usual, except that he was troubled with a tremor, which he thought was owing to the climate; that he wished to leave "this section of the country" as soon as he could, and designed to go East, and would stop over one day with them to rest. In this connection the complainant has introduced evidence tending to show that he at first attempted to write the letter to the Adamses with a pen, but that the tremor of his hand was such that he could not use a pen, and that he finally wrote the letter with a pencil. It is further shown that the deceased was a man of orderly habits, and that it was his custom to destroy waste papers by burning them, and it is claimed, upon proof of all the circumstances, that the paper he burned on the occasion referred to was undoubtedly that upon which he had attempted to write the letter to the Adamses with a pen. Moreover, the attorney who drew the will testifies that it was drawn on a sheet of legal cap parchment paper, of a yellow tinge, and longer and wider than ordinary legal cap paper, and, if this be so, it is quite clear that the paper which Mrs. Case saw the deceased destroy does not answer the description of that on which the will was drawn. Giving due weight to all the proof we have on this question, it is, in my judgment, inadequate to establish the claim that the deceased then destroyed the will. In the light of all the circumstances it seems much more probable that the paper he burned was that which he had attempted to use in writing to Mr. and Mrs. Adams. This being the conclusion of the court, it must be held that there is no affirmative proof in the case that the testator destroyed the will. At the same time it is to be observed that there is no evidence of its destruction by any other person whose interests were adverse to the will. Mr. and Mrs. Adams did not see Mr. De Forest after he made the will, until his death; they had no access to his papers or trunks at any time when the will could have been abstracted therefrom, nor do they appear to have known that he had made the will now sought to be established, until they learned it from Mr. Case when on their way to Rochester to attend the burial; and at that time they seemed to have supposed that the will then spoken of was that which Mr. De Forest had made in 1876. This, I think, is a fair inference from the testimony.

On the whole, looking at this case in all its aspects and in the light of all the circumstances that surround it, I am constrained to believe that the will was at some time after it was last seen in October, 1887, accidentally lost from the custody of the testator. Undoubtedly many wills once deliberately

executed are afterwards secretly destroyed by the persons who made them; but the circumstances here are such that they seem strongly inconsistent with the theory that such was the fact in this case. The envelope in which the will was originally placed and the memorandum made by the testator himself, from which the will was drawn, were preserved, and were found in the place where it was most natural to look for the will. It certainly seems very improbable that the deceased would secretly destroy the will, and at the same time preserve the envelope and the memorandum. These papers must have been deposited by him in the place where they were found, and it is reasonable, I think, in the light of all the circumstances, to believe that he supposed the will was there also.

As is apparent from the statement of the facts heretofore made. Mr. De Forest on more than one occasion carried the will in his pocket, and was seen to have it in his hand out of the envelope, from which it is not unreasonable to infer that the will may, at one of these times, have been mislaid and lost, while he may have supposed that it was in the envelope, and securely deposited in the tin trunk. Moreover, I have not been able to resist the belief that it was not impossible for the loss to have occurred during the various examinations of the trunk after its return to Chicago, though I must admit that this can hardly be said to be more than a possibility. It is proven that at the time the trunk of the deceased was being packed, and when he remarked that he wished to have the tin trunk packed carefully, as he had important papers in it, Mrs. Southworth said to him that she supposed the will was in that trunk, and that he made no reply. From his silence when thus addressed, it is argued that the inference is that the will had been destroyed. But this does not follow. He may not have cared to make any reply. He may have chosen to evade a reply. For a man of his character and temperament, his silence may have been entirely natural. He may have thought it unnecessary to make any reply, as he had just remarked that the trunk contained important papers; in other words, this silence may have been just as consistent with the continued existence of the will as with any other theory. Moreover, the evidence is that he was so deaf that he sometimes used an ear trumpet, and he may not have heard Mrs. Southworth's remark, although she states that he could hear some persons very much better than he could others, and that he always said that he could hear her very readily. Nevertheless, it is not at all improbable that he did not then hear what she said.

The testimony of the witness Chadderdon, the teamster who carried Mr. De Forest and his trunk to the railroad depot in Whitewater, if true, fully sustains the theory that the deceased supposed his will was in existence on the very day he died. Speaking of what transpired at the depot, he testifies as follows: "After we had set down the trunk, he (meaning Mr. De Forest) walked up where they checked the trunks. Directly he returned to me, and I said to him, 'Father De Forest, I am sorry to have you g｡ away.' He said it wouldn't be for long; if nothing happened he should be back in the spring; and I then said to him, 'I am sorry to see you go away alone; you are a pretty old man to travel alone.' He answered that he was used to traveling alone, and it didn't matter, he said, where he fell. He said, 'I have my business all settled, and I have my will here with me in the trunk.' Our conversation then was broken off; the train arrived."

The proof is that no one was present at this conversation, if it occurred, except Mr. De Forest and the teamster. This testimony is severely attacked, as stating not only an improbable, but a corruptly manufactured, story. After such a lapse of time, there should, of course, be taken into account, in considering the testimony, the liability of the witness to be mistaken in his recollection of just what was said, and the possibility that from the infirmities of memory he may now be unable to state the conversation with accuracy; but I do not think the claim that his testimony is a corrupt fabrication is established by the evidence. To justify a settled belief that the statements of the witness are willfully fabricated, the court should not rest its judgment upon possibilities; it should have strong circumstances and tangible facts plainly pointing to such a conclusion.

As to the question of the credit to be attached to this testimony upon the theory that it is honestly given, but that it may still be inaccurate and unreliable, and therefore of doubtful value, I do not deem it necessary to discuss it. since I am of the opinion that, treating the testimony of this witness as only in a limited degree corroborative, the conclusions of the court upon the merits of the case must be as already indicated.

It has been argued that it was unnatural for the deceased to make a will diverting the larger portion of his estate from his sole heir at law, and she his daughter. Nevertheless, that he made such a will cannot, in the face of the evidence, be reasonably denied, and, in view of his relations to the various legatees in the will, and of the circumstances of his situation in the last years of his life, and of all the facts. I do not deem the will so devoid of reasonableness as the counsel for the defendant claim it to be. By the will he remembered all persons bound to him by ties of kinship or affection. He disinherited none. His estate at the time of his death. as I conclude from the testimony, amounted to about $9,-

000, although, in consequence of subsequent appreciation in value, it may now amount to $12,000 or more. He gave to Mrs. Adams by the will the use of $3,000 for life, and took care that at her death her children shall have the principal of that bequest. Then he gave to them $800 more. In considering the question of the reasonableness of the will, it is also to be borne in mind that he had secured to Mrs. Adams $2,000 in the shape of insurance on his life. Then he gave to Mrs. Case and her son only about $600, and, after giving to Mrs. Southworth's son $300 and to the Bible society $500, he bequeathed the residue to Mrs. Southworth, evidently because he considered her in greater need of such a provision than were the other recipients of his bounty. Looking at this will as nearly as we may from the standpoint he occupied when he made it, taking into consideration, as we must, the relations in which he stood towards all upon whom he wished to bestow his estate, it can hardly be maintained that the will is repugnant to such a sense of justice as a person in his circumstances might well be supposed to naturally feel and act upon.

In view of all the considerations stated, it is the opinion of the court that a decree should be entered declaring that the deceased died testate, and establishing the will.