# THROCKMORTON *v.* HOLT.

EVIDENCE; DECLARATIONS OF A DECEDENT; WILLS, REVOCATION
OF; PRACTICE; ORDER OF PROOF; EXPERT TESTIMONY;
REBUTTAL TESTIMONY.

1. Upon the trial of issues framed upon the caveat of a partly burned
and mutilated paper purporting to be a will, received by the
Register of Wills through the mails from an unknown source
about a year after the death of the decedent, whose will it
purports to be, and dated more than twenty years before his
death, and which leaves his entire estate to two persons con-
nected with him by marriage, to the exclusion of his next of
kin, which issues raise the questions of whether he executed
the instrument as his will, and, if so, whether he revoked it,
the declarations and acts of the decedent at any time between
the date of the alleged will and his death, showing the state of
his feelings and apparent intentions towards his next of kin
and the persons named as legatees, are competent both upon
the question of the execution of the paper and upon the ques-
tion of revocation, especially where there is evidence by com-
petent experts that the alleged will is not genuine, and that
the signatures of the witnesses, who are dead, were forged.

2. The decedent's declarations, in such a case, tending to show the
making of a will in favor of one of his next of kin and appoint-
ing him his executor, are not competent to prove the execu-
tion of such a will; but are admissible as one among other
circumstances tending to show the state of mind of the decedent
and shed light upon the question of revocation by mutilation
of the instrument offered for probate, and also upon the issue
as to whether such paper was a forgery.

3. The order of proof is within the discretion of the trial court, the
exercise of which will not be disturbed on appeal except when
abused; *following* Olmstead v. Webb, 5 App. D. C. 38, and
Lansburgh v. Wimsatt, 7 Id. 271.

4. Whether evidence of opinion in respect of the authorship of a
paper-writing by a competent judge familiar with the learn-
ing, culture and literary style of the alleged writer, is not
equally competent and credible as that based solely upon
knowledge of his handwriting, *quære.*

5. Error assigned upon the admission of incompetent evidence that
was subsequently withdrawn from consideration by the charge
of the court will not be considered on appeal, save in excep-
tional cases.

6. When a defendant, to contradict testimony that a given signature is genuine, adduces testimony to the effect that the peculiar formation of a letter of the disputed signature appears only in proportions of one to four of the signatures of the writer, with which he is familiar, testimony offered by the plaintiff in rebuttal that such peculiarity is not an unusual feature of the signature in question, but is frequently, if not habitually, found therein, is not proper rebuttal testimony.

No. 712. Submitted April 7, 1898. Decided May 3, 1898.

HEARING on an appeal by the caveatees from a judgment of the Orphans' Court refusing probate to an alleged will, entered upon the verdict of a jury upon issues certified from that court for trial. *Affirmed.*

The COURT in its opinion stated the case as follows:

This is an appeal from a judgment of the Supreme Court of the District of Columbia, holding sessions for Orphans' Court business, refusing probate of an instrument offered therefor as the last will of Joseph Holt, deceased.

The said Joseph Holt, who had been a distinguished lawyer and was generally regarded as an accomplished speaker and writer, was born in the State of Kentucky, in 1807. He came to Washington in 1859 to accept the position of Postmaster General in the cabinet of President Buchanan. Later he became Secretary of War in the same cabinet, and remained until the inauguration of President Lincoln. In 1864 he was appointed Judge Advocate General of the Army of the United States, from which he retired in 1875. He continued to reside in Washington after his retirement. He had been twice married, but had no children. His first wife, Mary Harrison, who died in 1846, was the first cousin of Elizabeth Hynes, one of the legatees of the will offered for probate. In 1850 he married Miss Wickliffe, who died in 1860. She, it appears, was the cousin of the mother of Josephine Holt Throckmorton, the other legatee named in said will. The latter was also the goddaughter of deceased.

He had several brothers and sisters, all of whom predeceased him, leaving children who are the appellees herein. One of these, a citizen of Texas, had been living in the city of Washington for several years before his uncle's decease; others lived in Kentucky, Indiana and Mississippi.

Judge Holt lived alone, attended by several servants, who had been some years in his employ. Immediately after his death, the nephew living in Washington, William G. Sterett, went to the house with his wife, and, on the next day, was joined by another nephew, Washington Holt, who lived in Kentucky.

Pursuant to directions given them by deceased shortly before his death (as they testified), the servants delivered his private keys to Washington Holt. Search was made by Holt and Sterett among the papers of deceased in the house for a will. They testify that no will was found, and that the only thing of a testamentary nature discovered was an unsigned memorandum of a bequest of "—— dollars" to the Washington Humane Society. This had no date, but must have been made after February 13, 1885, as that is recited therein as the date of the act of Congress incorporating said society.

It appears that deceased had preserved his papers and letters with great apparent care. They were found in packages carefully endorsed, and there was testimony tending to show that in his last years, when his sight was impaired, he could direct his servants where to find a package that he wanted. Memorandum books were found showing careful entries of trips taken and expenses paid, and one contained entries of daily expenditures.

After or during this search for a will, the nephews say that they caused to be burned in the yard, by one of the servants, some old letters to deceased from Washington Holt and his family; and some old newspapers and circulars were burned in the fireplace in one of the rooms of the house.

Some days later, at the request of Washington Holt, the Register of Wills searched the house carefully, but found no will.   An employee of the Register's office made a search also without success.   He saw the evidence of the burning of papers in the fireplace and yard, and suggested the sealing of all papers, which was done.

Deceased had a box in the vault in the National Safe Deposit Company of Washington, in which some papers were kept.   The trust officer of that company examined these, and found a will bearing date April 9, 1848, and a memorandum on a rough piece of paper as follows:

"Humane Society, $1,500.

"Children's Hospital, 4,000.

"Lodging House, 1,500.

"Emergency Hospital and Dispensary, 1,500.

"Associated Charities, 1,500."

No will having been found, on August 17, 1894, Washington Holt, William G. Sterett and John Holt filed a petition for letters of administration, which resulted in the appointment of the National Safe Deposit, Savings and Trust Company, of the city of Washington, as administrator.

The paper offered for probate in this case as the last will of Joseph Holt made its appearance in the following manner:

It was received by the Register of Wills in the morning mail delivery, August 26, 1895, enclosed in an ordinary envelope of "official" size, together with a piece of pasteboard.   There was no other enclosure, and nothing to indicate the source from which the document came.   The address—"To the Register of Wills, D. C."—was in large irregular letters, after the form of print, made with pen and ink.

The postmarks on the package indicated that it had been deposited in one of the many mail boxes situated in the northwest quarter of the city of Washington, and had been

delivered at the general postoffice 6 p. m., August 25, 1895.

The paper, when received, showed signs of mutilation by burning and tearing; the place where the seal would appear, if affixed as indicated in the recital of the next to the last line, was roughly torn away. It purports to have been "signed and sealed" on February 7, 1873. There is no attestation clause before the signature of the three witnesses, Ellen B. E. Sherman, U. S. Grant and W. T. Sherman. These follow the name of the testator, with a slight interval between his and the first of them. Ellen B. E. Sherman was the wife of W. T. Sherman, who was then General Commanding the Army of the United States, and U. S. Grant was then President.

The paper was torn nearly, if not entirely, across the page between the signature of the testator and that of the first witness. There was testimony tending to show that the separation was complete; but the weight of the evidence tended to show that it was not entirely separated at one end. A photo-lithographic copy of this will, as it then appeared, is found in the record, which fairly represents its appearance and condition, save in respect of the severance of the paper and the mutilation where the seal is supposed to have been. It is here reproduced. [See insert opposite.]

No testimony was produced during the trial tending to shed any light upon the mysterious appearance of this will. All the parties disclaimed any knowledge of its existence until the news of its receipt by the Register of Wills had been published.

The executor, Luke Devlin, filed his petition to probate the instrument as the last will of the deceased, and for letters testamentary on September 20, 1895. The appellees, as next of kin, filed their caveat October 18, 1895, and answer thereto was filed December 2 by Luke Devlin, the executor, and Misses Elizabeth Hynes and Josephine Holt Throckmorton, the two legatees named in the said will.

On March 20, 1896, the following issues were made up in

In the name of God Amen

I J Holt of the City of Washington D.C. being of sound mind declare this to be my last will & Testament

I do hereby give devise & bequeath all of my property — both personal & real to Lizzie Hynes — Cousin of my First wife & to Josephine Holt Throckmorton — who is my God child & to their heirs & assigns forever. I do hereby direct that at my death all of my property be divided equally between them —

Lizzie Hynes is to inherit hers at my death Josephine at the age of 21, her Father Maj Charles B Throckmorton will hold her share in trust —

I appoint Mr Luke Devlin of the City of Washington D.C. whose character I believe to be of the highest Standard & who will I am certain carry out my wishes my Executor

Signed & sealed by me in the presence of these witnesses in the City of Washington D.C.

Feby 7th 1873 —

J Holt.

Ellen B E Sherman

U S Grant

W T Sherman

the Orphan's Court and transmitted to the special term holding the Circuit Court for trial by jury:

"1. Was the paper-writing bearing date the seventh day of February, A. D. 1873, which was filed in this court on the 26th day of August, A. D. 1895, executed by the said Joseph Holt as his last will and testament?

"2. Was the execution of said paper-writing procured by fraud exercised and practiced upon said Joseph Holt by any person or persons?

"3. Was the execution of said paper-writing procured by the undue influence of any person or persons?

"4. If the said paper-writing was executed by the said Joseph Holt as his last will and testament, has the same been revoked by said testator?"

The proponents, or caveatees, proved the death of the subscribing witnesses, and then offered testimony tending to establish the genuineness of their signatures as well as that of the testator. Senator John Sherman testified to the genuineness of the signature of his brother, General Sherman; Col. Frederick D. Grant to that of his father, President Grant; and P. Tecumseh Sherman to that of his mother, Mrs. Ellen B. E. Sherman. The latter also testified that Mrs. Sherman usually wrote her name, "Ellen Ewing Sherman;" but that it was her habit to sign legal papers "Ellen B. E. Sherman," as it appears on said will. Henry B. Burnett gave his opinion that the body of the will and the signature of the testator were written by Judge Holt.

The will was then read to the jury. Miss Hynes and Miss Throckmorton each testified that she had not heard of the said will until after its appearance in the office of the Register of Wills. The executor, Luke Devlin, was then examined, and testified as follows:

"That the said paper-writing was never in his possession, and that he first saw it in the office of the Register of Wills on the day it had been received there." On cross-examination the said Devlin testified that "he knew the said Joseph

Holt well since 1862, having been a copyist and messenger at that time in the office of the Judge Advocate General when said Holt succeeded to that office; that he continued to be employed in said office until 1876, when the said Holt retired therefrom; that he had little communication with him in relation to office matters; that he visited him once or twice at his house; that he was in the habit of meeting him socially at the residence of Mrs. Throckmorton, sr., the grandmother of Miss Josephine H. Throckmorton, from 1865 to 1878; that he had not seen Mrs. Throckmorton, sr., more than four or five times during a period of more than ten years preceding the receipt of the will at the register's office, and on learning of the existence of the will he had to consult the city directory to ascertain where she then lived; that on the day the will reached the Register of Wills he received a telephone message from the register, went to his office, and saw the will for the first time; then called on Mrs. Throckmorton, sr., and on the same day he telegraphed Miss Josephine H. Throckmorton of the finding of the will, having first learned the address of her father upon inquiry at the War Department; that he called on several occasions in later years at said Holt's house and was informed by the colored servants that he was out or that he was engaged, and asked witness to call again, the last of these visits being about April 9, 1894, shortly before his death; that he met said Holt outside on several occasions, the last of which was about two years before his death, and conversed with him."

Caveatees then announced that their *prima facie* case was closed. Counsel for the caveators objected that it was incumbent upon the caveatees to introduce all the testimony essential to the establishment of the will before they should be called upon to reply. The court ruled that because of the fact that there was no attesting clause to the will, it was proper and necessary for the caveatees to offer all the evidence they proposed to offer upon the subject of the

genuineness of the signature of Joseph Holt. Caveatees acquiesced in this ruling as within the discretion of the court, and offered a number of witnesses, who testified to familiarity with the handwriting of the testator, and expressed the opinion that he wrote the body of the will and the signature thereto.

Caveators introduced a number of witnesses, also familiar with testator's handwriting, who testified that in their opinions the will and signature of the testator were not genuine.

One witness, who had been a clerk in the War Department for thirty years, expressed the opinion that the signatures of President Grant and General Sherman were not genuine.

Three experts in handwriting expressed the opinion that the signature of Mrs. Sherman was not written by her. These were contradicted by an equal number of experts on behalf of the caveatees. A great many genuine letters and documents written by deceased were read in evidence and exhibited to the jury. Among these was his own will, dated April 9, 1848, and one written by him for Miss Hynes about January 1, 1886.

Testimony was offered by the caveators of declarations made by testator, after the date of the said will, tending to show his feelings, sentiments and conduct in relation to his next of kin and to the father and grandmother of Miss Throckmorton, as well as his intentions in respect of the disposition of his estate. This evidence was all objected to by the caveatees, and exceptions were taken to its admission. Caveatees also introduced evidence tending to show intimate and affectionate relations between the testator and Misses Hynes and Throckmorton, the legatees. He had made regular gifts of money to the former for years, and in 1884 gave her $10,000 in 6 per cent. bonds of the District of Columbia.

No evidence having been introduced in support of the second and third issues, relating to the procurement of the

execution of the will by fraud and undue influence, the court instructed the jury to return the answer "no" to each.

The jury returned a verdict answering "no" to the inquiry whether the will was executed by Joseph Holt.

To the fourth question, whether Joseph Holt had revoked the said will, if in fact executed, the jury answered "no, because it was not executed."

The findings of the jury were duly certified to the Orphans' Court, and in accordance therewith, on July 10, 1896, the order was made denying probate.

*Mr. J. J. Darlington, Mr. William G. Johnson, Mr. Benjamin Butterworth* and *Mr. Blair Lee* for the appellants:

1. The court erred in admitting in evidence as competent to prove the will in controversy a forgery declarations alleged to have been made by the testator, but not until many years after the making of the will, as to actual or intended dispositions of his estate inconsistent with the will, and as to his then-existing relations with and feelings toward certain of his relations not named in said will, and also in admitting testimony as to alleged acts and declarations by said testator tending to show the existence in his mind, many years after the making of the will, of hostile feelings toward persons nearly and remotely connected by consanguinity and affinity with persons named as beneficiaries in said will. This class of evidence has been uniformly excluded by courts in all considered cases of authority. *Boylan* v. *Meeker* (1860), 28 N. J. L. 274–478; *Waterman* v. *Whitney*, 11 N. Y. 157; *Johnson* v. *Hicks* (1869), 1 Lans. N. Y. 150; *Hayes* v. *West* (1871), 37 Ind. 21; *McDonald* v. *McDonald* (1895), 142 Ind. 55; *Kennedy* v. *Upshaw* (1885), 64 Tex. 411; *Leslie* v. *McMurtry* (1895), 60 Ark. 301; *Massey* v. *Huntington*, 118 Ill. 80; *Dickie* v. *Carter*, 42 Ill. 376; *Mooney* v. *Olsen*, 22 Kan. 69; *Goods of Ripley*, 1 Sw. and Tr. 68; *Gibson* v. *Gibson*, 24 Mo. 227; *Cawthorne* v. *Haynes*, 24 Mo. 230; *Walton* v. *Kendrick*, 122 Mo. 504;

*Thompson* v. *Updegraff,* 3 W. Va. 629; *Conch* v. *Eastham,* 27 W. Va. 796; *Shailer* v. *Bumstead,* 99 Mass. 112; *Marx* v. *McGlynn,* 88 N. Y. 357; *Griffith* v. *Diffenderfer,* 50 Md. 466.

The conclusions reached in these cases will be found to be adopted by the text writers as presenting the law on this important subject. 1 Redf. on Wills, 557; Schouler on Wills, Sec. 241; Cassody on Wills, Sec. 310; Gillett on Indirect and Coll. Ev., Sec. 281.

In the cases of *Boylan* v. *Meeker, Johnson* v. *Hicks, Hayes* v. *West, Kennedy* v. *Upshaw, Leslie* v. *McMurtry* and *McDonald* v. *McDonald,* cited above, the question of forgery was an issue and in every instance the court held the declarations of the testator inadmissible evidence upon that issue, while in all the other cases the general doctrine is maintained that the declarations of the testator are admissible only to show the mental condition of the testator where that is a pertinent inquiry under the issues. There was no question of mental capacity involved in this case.

The validity of the will of a person of sound mind can never depend upon the ability of the legatees or devisees to demonstrate the motives, scarcely ever made public by the testator, for the particular provisions of the will, or the suggestions, by contestants, of contrarient motives, founded upon alleged declarations of the testator. If Joseph Holt, on the 7th of February, 1873, was of sound mind, which is conclusively established for the purposes of this case, he undoubtedly had motives sufficient for him for making any testamentary disposition of his estate, no matter how improbable, unreasonable or unjust they may appear, more than twenty-five years later to persons not cognizant of those motives. The probability, therefore, of his having executed this or any other will at that time, we submit can not be affected by the present ignorance of any one as to what were his then motives or the present knowledge of any one as to what were his subsequent feelings.

The only decision of an appellate tribunal that counsel

have been able to find which seems to assert the doctrine of the admissibility of declarations of testators, when not of the *res gestae*, to prove execution or non-execution of a will, is that of *Hoppe* v. *Byers*, 60 Md. 381. A careful analysis of the opinion in that case will show that it is unsupported by authority, is opposed by the great weight of authority, and upon principle and sound reason can not be regarded as a safe precedent. While some loose expressions may be found in text books, and imperfectly reported *nisi prius* cases, which seem to support the position there taken, these have been misunderstood and upon careful examination these will be found to be a more apparent than a real support.

2. If a will be torn, burned or otherwise defaced by the testator, or by another by his direction and consent in his presence, though it be not destroyed, but only slightly defaced, if the defacement be done *animo revocandi*, it is a good revocation. To prove the *animus* with which the act is done or directed to be done, proof of the declarations of the testator of his purpose or intent are admissible. But the distinction is clear and well and firmly fixed by the authorities that the declarations are admissible to prove the intent, but not the act. In this case, there being no evidence tending to show that Holt defaced the will, his declarations were not admissible under the issue of revocation. *Sewall* v. *Slingluff*, 57 Md. 537; *Wittman* v. *Goodhand*, 26 Md. 95; *Allen* v. *Huff*, 1 Yerger, 404; *Ladd's Will*, 60 Wis. 187; *Hylton* v. *Hylton*, 1 Gratt. 161; *Perjue* v. *Perjue*, 4 Iowa, 521; *Crocker* v. *Chase*, 57 Vt. 413.

In order to maintain the claim of revocation by a subsequent will it is essential—(1) To prove by clear and satisfactory evidence the actual execution of a later will and its continuance in force to the death of the testator. (2) The production of such later will. (3) If it can not be produced, it must be established by clear and satisfactory evidence that it contained either an express revocatory

clause or that its provisions were so far inconsistent with the former will that the two cannot stand together. *Nelson* v. *McGiffert*, 3 Barb. Ch. 158; *Wallace* v. *Wallace*, 114 Mass. 510; *Cutto* v. *Gilbert*, 9 Moore, P. C. C. 131; *Brown* v. *Brown*, 8 E. & B. 876; *Clark* v. *Morton*, 5 Rawl. 235; *Caeman* v. *Van Hart*, 33 Kans. 333.

While it may be conceded that declarations of an intent to revoke are admissible to show the *quo animo* of an act of mutilation, the act must be proved *aliunde.* The declaration of intention can not supply the total absence of proof of the act. *Hise* v. *Fincher*, 10 Iredl. Law, 139.

3. The opinions of witnesses that the will in controversy was a forgery because of its grammatical and rhetorical style of composition, were incompetent, as was evidence of the characteristics of Holt with reference to his treatment of his superior officers as bearing upon the probability of his having asked such persons to witness his will. *Spence* v. *Spence*, 4 Watts, 135; *Ramadge* v. *Ryan*, 9 Bing. 333; *Railroad Co.* v. *Kellogg*, 94 U. S. 469. The peculiar official relations of the testator with the witnesses was not a matter which justified the introduction of opinion testimony as to what would have been the proprieties or whether or not Holt was a man who would have observed such a standard of propriety.

4. The testimony of P. Tecumseh Sherman that certain features in the signature of General Sherman which the caveators gave testimony tending to prove did not exist in his genuine signature, were in fact of frequent or habitual occurrence in genuine signatures, was competent in rebuttal, as was the evidence of the witness Bingham to the effect that, judged by the handwriting and composition of the will in controversy, taken together, and with which he was familiar, the will was genuine. See *Wentworth* v. *Railroad Co.*, 143 Mass. 248; *Com.* v. *Leach*, 156 Mass. 99; *Railway Co.* v. *Falvey*, 104 Ind. 409; Gillett on Ind. and Coll. Ev., Sec. 61.

5. If this court shall reverse the judgment and award a new trial, the new trial should be confined by the judgment of this court to the two issues of forgery and revocation. *Lisbon* v. *Lyman,* 49 N. H. 553; *Robbins* v. *Townsend,* 20 Pick. 345; *Bank* v. *Root,* 2 Met. 522; *Codman* v. *Dexter,* 148 Mass. 421.

*Mr. J. M. Wilson* and *Mr. A. S. Worthington* for the appellees:

1. The conduct of Joseph Holt from February 7, 1873, until his death, throwing light upon his relations with the beneficiaries under the instrument in controversy and with his blood relatives, was competent evidence upon the first issue. It was also competent as bearing upon the fourth issue relating to revocation. And his declarations during that period, which were admitted in evidence on behalf of the caveators, were competent upon both issues as tending to show his beliefs, feelings, purposes and designs.

There have been a number of stoutly contested will cases in this jurisdiction in the last ten years which have gone to and been decided by the proper appellate tribunals. In all of them, without exception, evidence has been received on both sides as to the alleged testator's conduct and declarations down to the day of his death. *In re Hoover,* 18 D. C. 541; *In re Hoover,* 19 D. C. 495; *Barbour* v. *Moore,* 4 App. D. C. 535; *Olmstead* v. *Webb,* 5 App. D. C. 38; *Ruppert* v. *Wolf,* 4 App. D. C. 556; *Barbour* v. *Moore,* 10 App. D. C. 30. See, also, *Hoppe* v. *Byers,* 60 Md. 381; *Johnson* v. *Brown,* 51 Tex. 65.

So far as we can gather from the opinions of the judges in *Boylan* v. *Meeker,* 28 N. J. L. 274, the case chiefly relied upon by the appellants, the subsequent declarations which were relied upon by the opponents of the will in that case were largely, if not wholly, declarations as to the fact of his having made or not having made a will, and not declarations showing or tending to show his feelings towards the various claimants of his property. And certainly no mem-

ber of the court seems to have made the distinction upon which the present case turns—that is, that such declarations when they relate to past transactions, whether admissible or not to show the truth of the statements, are admissible to show the feelings, purposes, intentions, and knowledge of the testator. The same will which was involved in *Boylan* v. *Meeker* came before a Federal court in an action of ejectment, and all the declarations of the testator were admitted. *Turner* v. *Hand*, 3 Wall. Jr. 92. See, also, *Taylor Will Case*, 10 Abb Pr. (N. S.) 300; *Collyer* v. *Collyer*, 110 N. Y. 481.

2. The universal doctrine, even as to wills of real estate under statutes similar to the one in force in this District, is that any burning, tearing, or cancellation of the will is sufficient to amount to a revocation when it is done by the testator or under his direction with the intention of revoking the instrument. And as to the tearing off or obliteration of the seal from the will, that has always been held to be a sufficient act of revocation. *Davies* v. *Davies*, 1 Lee, 444; 5 Eng. Ecc. R. 407; *Lillie* v. *Lillie*, 3 Hag. 184; *Price* v. *Powell*, 3 H. &. N. 340; *Avery* v. *Pixley*, 4 Mass. 400.

The will in controversy, when it came to light in 1895, bore upon its face three marks, any one of which was sufficient to amount to a revocation if done by the testator *animo revocandi*. These three marks were burning, tearing, and the removal of the seal. And unless the paper is shown to have come from the possession of some one interested in its destruction, there is a presumption that the testator himself burned and tore the paper and removed its seal with the intention of revoking the will. In that case evidence would be admissible for the purpose of rebutting the presumption on the one hand and of supporting it on the other, as to the testator's conduct and declarations up to the time of his death. This is now practically the universal rule. The same principle applies where the will can not be found. *Collagan* v. *Burns*, 57 Me. 449; *Rich* v. *Gilkey*, 73 Me. 595. Declarations like those in dispute were always

received and considered by the ecclesiastical courts in England before the jurisdiction of those courts was taken away by 20 and 21 Vict., Ch. 77; 1 Wms. on Executors, 290. The cases in those reports in which this was done are almost innumerable. *Loxley* v. *Jackson,* 3 Phill. 126 ; *Lillie* v. *Lillie,* 5 Eng. Ecc. Rep. 184. In the more recent case in England of *Eckersley* v. *Platt,* L. R., 1 P. & D. 281, evidence of the subsequent declarations of the testator was received as a matter of course where the issue was as to the revocation of a will. Another striking illustration of the competency and value of such declarations where a will had disappeared is to be found in the same volume. *Finch* v. *Finch,* L. R., 1 P. & D. 371. See also, *Betts Case,* 4 Cow. 483; 6 Cow. 377; 9 Cow. 208; 6 Wend. 173; *Lawyer* v. *Smith,* 8 Mich. 411; *Patterson* v. *Hickey,* 32 Ga. 156; *In Re Valentines' Will,* 67 N. W. Rep. 12; *Sugden* v. *Lord St. Leonards,* 1 P. D. 154; *Pickens* v. *Davis,* 134 Mass. 252; *Weeks* v. *McBeth,* 14 Ala. 474; *Beadles* v. *Alexander,* 9 Baxter, 604; *Adams* v. *Norris,* 23 How. 353.

A striking illustration of the rule of evidence for which we are contending arises in those cases where a presumption of revocation arises from a great change in the circumstances of the testator, such as marriage and the birth of a child. In such cases there seems to be no doubt that the subsequent declarations of the testator are competent as rebutting (or supporting) this presumption of revocation. *Miller* v. *Phillips,* 9 R. I. 141, 144; *Lugg* v. *Lugg,* 1 Ld. R. 441; *Brady* v. *Cubitt,* 1 Doug. 31; *Holloway* v. *Clarke,* 1 Phil. 339; *Hall* v. *Denck,* 1 Vern. Ch. 329.

3. The omission of the court to properly instruct the jury on any question of law arising in a civil case is not ground of error when the court has not been requested to give such instruction. See *Armstrong* v. *Toler,* 11 Wheat. 276, 277; *Castle* v. *Bullard,* 23 How. 172, 189, 190 ; *Express Co.* v. *Kountze,* 8 Wall. 353, 354; *Butler* v. *Maples,* 9 Wall., 766, 776; *Shutte* v. *Thompson,* 15 Wall. 151, 164; *Mut. Life Ins.*

*Co.* v. *Snyder*, 93 U. S. 393, 395; *Hartford Life Ins. Co.* v. *Unsell*, 144 U. S. 450, 451; *Hennock* v. *Dialogue*, 2 Pet. 15.

4. The court having withdrawn from the jury all opinions as to the genuineness of the alleged will, based either wholly or in part upon the composition or style of the paper, and instructed them to disregard it, the appellants have no just ground of complaint, even if such testimony was improperly admitted in the first instance. *Penn. Co.* v. *Roy*, 102 U. S. 458; *Hopt* v. *Utah*, 120 U. S. 438; *Railroad Co.* v. *Madison*, 123 U. S. 524; *Railroad Co.* v. *Volk*, 151 U. S. 73; *Boone* v. *Purnell*, 28 Md. 629; *Insurance Co.* v. *Martin*, 32 Md. 310; *Sittig* v. *Birkestack*, 38 Md. 160, 161; *Herrick* v. *Swamley*, 56 Md. 464; *Detroit* v. *Burr*, 56 N. Y. 665; *Gall* v. *Gall*, 114 N. Y. 109; *Coughlin* v. *Poulson*, 2 MacA. 308.

5. The judgment appealed from should stand, because upon the whole case the probate court should have refused to admit the alleged will to probate, and the justice presiding at the trial in the circuit court should have refused to admit it in evidence, or should have instructed the jury at the close of the evidence to render a verdict in favor of the caveators. The question involved here is, what is the presumption when nothing is known as to the custody of the paper from the time of its date until its appearance in the office of the Register of Wills, more than twenty-two years afterwards? We respectfully submit that here the presumption against fraud and in favor of innocence decides the question. The presumption against guilt is not confined to criminal cases. Whenever the question arises, in civil cases, in the absence of direct or circumstantial evidence sufficient to enable the court or jury to determine the question of fact involved, it will be presumed that of two theories, one involving wrongdoing and the other excluding it, the latter will be presumed to be the true one. 1 Greenl. on Evidence, Secs. 34, 35, (note *a*), 38*a* (note 2), 41, 80; Best on Evidence, Sec. 302 (note V); Lawson on Presumptive Evidence, 93, etc., Ch. V.

It is admitted by counsel for the caveatees that where, after the death of a testator, a will is found thus mutilated, where it was under his control while he was alive, the presumption is that he himself mutilated it; and in this case the will, assuming it to be genuine, is traced to the possession of the testator. Necessarily it was in his possession when he executed it. There is no evidence that it ever left his possession during his life, and therefore the presumption must be that it remained in his custody till he died. Therefore counsel for the caveatees are asking the court to further infer that it was subsequently mutilated by somebody else. This involves a direct finding of fraud and crime. It is respectfully submitted that the presumption must be to the contrary. *Bennett* v. *Sherrod,* 3 Iredell, L. 305; *Knapp* v. *Knapp,* 10 N. Y. 270; *Bauskett* v. *Keith,* 22 S. C. 193; *Scoggins* v. *Turner,* 98 N. C. 137; *Colvin* v. *Fraser,* 2 Hogg. 140; *Madrin* v. *Guindon,* 2 Lee's Eccl. R. 406.

Mr. Justice SHEPARD delivered the opinion of the Court:

The leading question in the case arises on the several assignments of error relating to the admission of evidence tending to show the relations of testator, after the date of the will, with his next of kin and the family of one of the legatees, his sentiments and feelings towards them, and his intentions in respect to provisions for them in the disposition of his estate.

As we have seen, evidence introduced without objection tended to show the great and constant affection of the testator for Miss Hynes, whom he had chiefly supported for years. Miss Throckmorton was the testator's god-daughter, her mother was his second wife's cousin, and her father had in youth been his protégé.

The will in controversy divided his entire estate between Miss Hynes and Miss Throckmorton; the share of the latter to be held in trust by her father until she attained the age of twenty-one years.

There was also testimony tending to show that the testator had become alienated from some of his next of kin because they had espoused the cause of the South during the civil war. Letters were also introduced from the testator to two of his brothers and several nieces, written between 1867 and the date of the will, tending to show the existence of affection for and interest in them.

The testimony to which the exceptions apply may be summarized as follows: (1) Correspondence between testator and certain of his next of kin during the years that followed the date of the will, tending to show the existence of an affectionate interest in them. (2) Visits made by testator to Washington Holt at the old family home in Kentucky; his expressions of affection for his nephew and family. (3) Gifts of land adjoining the home to Mrs. Washington Holt; the erection of costly improvements on the old home place, and the further gift to her of $40,000 in Missouri State bonds. (4) Declarations of testator in 1881 showing anger with the Throckmorton family. On one occasion, when asked of them, he said angrily, "I do not know the Throckmortons." (5) Instructions by testator to his servants not to admit the Throckmortons to his house; and his conduct at a levee of President Arthur in refusing to speak to Major Throckmorton and turning his back upon him. (6) Declarations of testator between 1884 and 1893 that he had made Washington Holt his executor; that all he had would be his, and that he would arrange testator's burial; instructions to the servants to turn over his keys to Washington Holt, as he would have charge of his affairs, etc. (7) Some other declarations of similar purport, among them one made in 1893 to one Barclay to the effect that he had made a will and therein given some pictures to Barclay's mother.

All of this evidence was offered in support of the issue of forgery as well as that of revocation, and was objected to on both grounds.

The twelfth and thirteenth prayers of caveatees relating to the bearing of a part of the same on the issue of revocation were excluded:

"12. The jury are instructed that they can not consider alleged oral declarations of Joseph Holt to the effect that he had made a will creating Washington Holt his executor, or alleged declarations to the effect that Joseph Holt had made a will in Washington Holt's favor as showing or tending to show revocation of any will which the jury may conclude from the testimony was duly executed by the said Joseph Holt prior to such declarations.

"13. The jury are instructed that they can not consider any letters or writings offered in evidence, not themselves testamentary in character or not being in effect a last will and testament, for the purpose of showing or tending to show revocation of any will which the jury may conclude was duly executed by the said Joseph Holt prior to the date of such letters and writing."

The court granted the following prayer of the caveators applying to the same issue:

"4. As to the question of revocation the jury have the right to consider such burning and mutilation of the paper-writing in controversy as they may be satisfied from the evidence existed when it reached the office of the register of wills, together with all the evidence in the case tending to show any change occurring after February 7th, 1873, in the relations of the testator either to the persons named as beneficiaries in the alleged will or any of them or to those who would be entitled to his estate under the law if he had died intestate, and if the jury are satisfied from all this evidence taken together that such burning and mutilation was done by Joseph Holt or by his directions with the intention of revoking the same, then the jury are instructed that they should answer the fourth issue, 'Yes.' "

Further instructions, prayed by the caveatees, relating to the issue of revocation, by mutilation, and so forth, the

burden of proof thereon, and the effect of a subsequent will or paper-writing thereon, were given to the jury.

1. No special instruction relating to the particular bearing of the evidence of declarations and conduct of the testator, upon the question of forgery exclusively, seems to have been prayed by either party. Because of the omission of the caveatees in this respect, the caveators contend that its effect can not now be complained of. They contend that, being clearly admissible as bearing on the revocation of the will by mutilation, it was not the duty of the court to restrict its consideration to that issue, unless called upon by the interested party to do so.

Ordinarily, this would be the correct practice. But it is not necessary to consider whether the circumstances of this case would constitute an exception; because we think it sufficiently appears, from a paragraph of the general charge, taken in connection with the express purposes for which the evidence was offered, that it was intended to bear distinctly also upon the issue of execution.

That paragraph, to which exception was duly taken by the caveatees, reads as follows:

"You are also to consider the circumstances touching the relations of Joseph Holt to all the parties to this controversy, the next of kin, the people of his own blood, and the devisees under this will, up to the time of the date of this will, bearing directly upon this question whether it would be likely that he would have made such a will at that time and also the subsequent conduct of the testator towards his next of kin or heirs-at-law, and as well towards the beneficiaries under this will, as bearing upon the probability, the likelihood, of his having made such disposition of his estate as is made by this paper in controversy.

"If, upon the consideration of all this evidence, you reach the conclusion that this paper is not established to your satisfaction as the genuine paper of Joseph Holt, your answer to this first issue should be 'No.' If the evidence

positively satisfies you that he did not execute it, your answer should also be 'No;' for the question is, Was it executed by him?"

It is proper to add also, as bearing upon the weight of this evidence with the jury, the following paragraphs from the general charge:

"It is your province, gentlemen of the jury, to pass upon the evidence, and it is your duty to base your conclusions absolutely and solely upon the evidence. It is not your province to make a will for Joseph Holt, if in your judgment you should be satisfied that he ought to have made a different will from the will in controversy. It is not your province to unmake a will, unless the evidence is of such character as to satisfy you either that Judge Holt did not execute this paper, or, if he did execute it, that he subsequently revoked it.

"In passing upon these questions you should be influenced by no other motive than the desire to reach the exact truth. Let justice be done, no matter who is injured by your verdict. You are not responsible for the outcome of this case. It matters not to you, and it should not make any difference as to your conclusions upon the evidence in this case, whether the result will indicate prevarication or perjury on the part of any witness who has been examined in your hearing, whether that witness be high or low socially. It matters not to you, and you should not permit these considerations to influence your judgment to the slightest degree, what may be the subsequent outcome of this case, who will be injured by your verdict, either pecuniarily or who ultimately may be subjected to criminal proscution. It is not your province to determine, if this will is not genuine, by whom it was forged. Your province is to determine, simply, is it the genuine instrument of Joseph Holt? If it is the genuine instrument of Joseph Holt, then, as I have indicated to you, it is not your busi-

ness that the devise to these beneficiaries may cut out the next of kin and the blood relations of Joseph Holt.

" With the consequences you have nothing to do. Do not permit considerations of expediency or of sympathy for any one to enter into your deliberations. Render your verdict in accordance with the conclusions to which the evidence compels you, and let the consequences of such verdict adjust themselves and rest where they may."

2. It seems to us quite clear, both on principle and authority, that this evidence, including the declarations of the testator tending to show, after the date of the will, renewed and increased affection for his next of kin, as well as estrangement from the family of one of the legatees, and an independent provision for the remaining legatee, for whom his affection remained unabated, was competent as tending to maintain the issue of revocation.

If the will had been found among the papers of the testator unmutilated, the evidence would clearly have been incompetent to prove revocation as an independent fact. If it had been there found, in its present condition, the presumption of revocation would at once attach. Coming to light at the time and in the manner in which this paper did, we are not sure but that the same presumption of revocation ought to be indulged.

Certainly it would be more just and more consistent with the reasons for the ordinary presumptions of law, to presume that the paper had remained under the control of the testator and had been spoliated by him, as he had the lawful right to do, rather than by a stranger, who, in suppressing or defacing the will of another, commits a heinous offense. The charge of the court, without expressly declaring the existence of a presumption under the circumstances of this case, nevertheless imposed the burden of proof upon the caveators to show that the acts of spoliation had been committed by the testator with the intention to revoke.

The evidence to maintain this burden was necessarily circumstantial.

In consideration, then, of the condition of the will and the manner in which its appearance was made, we can not escape the conviction that the state of mind of the testator, during the more than twenty years in which the will was subject to his unrestrained control, as indicated by his changes of feeling towards the parties at interest, was a material circumstance to be considered by the jury in determining whether the mutilation was the result of an intent to revoke. *Lawyer* v. *Smith,* 8 Mich. 411, 423; *Patterson* v. *Hickey,* 32 Ga. 156, 164; *Burge* v. *Hamilton,* 72 Ga. 568, 625; *Callagan* v. *Burns,* 57 Me. 449; *Collyer* v. *Collyer,* 110 N. Y. 481, 484; *McDonald* v. *McDonald,* 142 Ind. 55, 81; *Miller* v. *Phillips,* 9 R. I. 141, 144; *In re Valentine's Will,* 93 Wis. 45, 55; *Pickens* v. *Davis,* 134 Mass. 252; *Sugden* v. *Lord St. Leonards,* L. R. 1 Prob. Div. 154, 176, 219, 225, 232, 241; *Gould* v. *Lakes,* L. R. 6 Prob. Div. 1, 5.

3. This brings us to the consideration of the important question that has been chiefly argued by counsel, namely, whether the foregoing evidence was competent for the consideration of the jury in determining the issue joined on the genuineness of the will.

In that consideration, it must be remembered that the subscribing witnesses had long been dead; that the genuineness of their signatures had been supported and attacked by competent and respectable evidence in the nature of opinions; and that whilst many witnesses had expressed opinions in favor of the genuineness of the will and the testator's signature thereto, many others of equal credibility, apparently, and opportunities to know the handwriting of the deceased testator, had pronounced against both as forgeries. In addition, we have the mysterious, unexplained deposit of the instrument in one of the public mailing boxes. The jury were required to find if Joseph Holt actually wrote this will and affixed his signature thereto.

The contention of the appellants is supported by the citation of many cases denying the competency of such evidence, especially the subsequent declarations of the testator, on that issue.

The rationale of decision in a considerable number of these might, probably, be reconciled with the decision of competency under the exceptional circumstances of this case; but it would serve no useful purpose to occupy time with their review and the discussion of their respective weight. As the question is one of first impression in this jurisdiction, we are free to adopt the conclusion that seems to us to be the most reasonable, and that accords with the smaller number of cases relied on by the appellees.  In one of these, whose analogy is striking, the Court of Appeals of Maryland, after much consideration of the principles involved, as well as the authorities, declared the evidence competent.  *Hoppe* v. *Byers*, 60 Md. 381, 390.  See, also, the charge of Mr. Justice Grier to the jury in *Turner* v. *Hand*, 3 Wall. Jr. 88, 92; Stephens' Dig. Evidence, Art. 29.

We do not mean to say that such evidence would be competent to establish the execution and existence of an undiscovered will, any more than to prove the revocation of one actually produced without sign of spoliation; for that would be, in either case, to override the provisions of the statute law prescribing the formalities of execution and revocation. Nor would the same evidence be of sufficient weight to warrant the overthrow of a formal will produced and with execution proved by living witnesses of unimpeached credibility.

In fact, it was said in *Hoppe* v. *Byers*, *supra*, that under circumstances like those just mentioned, the evidence ought to be excluded.   But whether, in such event, the objection would lie to its competency or its credibility, the evidence would have so little weight that, if admitted, the court might properly charge the jury that it could not afford support for a verdict against the will.   The difficulty in the accurate

reproduction of oral declarations, as well as the danger of the jury being biased or prejudiced thereby, and therefore misled, seem to constitute the chief grounds of objection to the competency of this kind of evidence; but the same dangers lurk, though in less degeee, in all oral evidence of declarations, admissions and confessions of parties against their own interests. In respect of this, we concur in the views expressed by Mr. Justice Lumpkin, in *Patterson* v. *Hickey*, 32 Ga. 164, as follows: "It is said that the reason for not hearing parol proof is, that there is not the ordinary security that it is true. This goes to the weight of the evidence. It is true, there are many cases in which it would be entitled to but little weight; nay, but a few in which it would be entitled to any. Yet, if there be others, in which it would subserve the cause of truth and justice, it must be heard, leaving its effect to those whose province it is to weigh it. There is little danger in this, when the courts can aid the jury in pointing out its legitimate tendency."

Because, too, one who has executed and delivered a deed or a bond can not, by subsequent declarations, impeach its execution and obligation, it has been said, in many of the cases, that the same principle applies in the case of a will. In this we can not entirely concur. In the case of the delivered deed and bond the interest of the signer becomes wholly changed, and he can not be heard to disparage the title of the other party by declarations in his own interest. But the will is a radically different instrument; it is not made effective by delivery; it is ambulatory, and can take effect only upon the death of the testator; until then only is it beyond his power of recall by destruction, express revocation, or complete substitution by one of later date. By virtue of the statutory requirements in these respects, declarations before, at the time of, or subsequent to, the transaction inquired of, can not be received as sufficient to establish the same; nor should they be permitted to override positive, unimpeached proof of execution or revocation in accordance

with the required formalities.    But, in a case where such proof is lacking, or where, by competent evidence, the genuineness of the signature has been assailed to such an extent as to require the submission of the question of its forgery to the jury, we think the feelings of the testator towards all the parties, and his relations with them and apparent intentions as disclosed by his conduct and declarations, are competent for their consideration.    We agree with the Court of Appeals of Maryland, that "they are not to be taken as direct proof to establish the paper (or to destroy it), but merely as corroborative of such direct proof, or as a circumstance in a case of this character, where such direct evidence has been first given, proper for the consideration of the jury."    60 Md. 393.

Substantially the same views were expressed by Mr. Justice Grier, who presided in the circuit court on the trial involving the same will that was in controversy in the case greatly relied on by the appellants—*Boylan* v. *Meeker*, 28 N. J. Law, 274.    He said, in charging the jury (*Turner* v. *Hand*, 3 Wall. Jr. 88):

"While it is undoubtedly true that parol declarations of a testator made before or after executing his will ought not to be received as a ground for altering or annulling it, yet cases *may* arise where such declarations, in connection with other circumstances, may be taken into consideration, as, for example, where there is strong evidence of conspiracy and of fraud practiced on the testator, or that the instrument is forged and false.

"In order to elucidate this principle let us suppose a case. A will is produced in court, regularly proved according to law, yet, notwithstanding the legal proof it may possibly never have been seen by the testator, never have been signed and sealed by him, and consequently does not contain his will as to the disposition of his property.    Suppose it to have been made (as has sometimes been the case in Ireland and other places) by some person personating the

testator, and simple and perhaps honest people have thus been prevailed upon to attest it.. In such a case the signatures may be so palpably a forgery as at once to detect the fraud to any judge of handwriting. Again, suppose the will disinherits a child, a grandchild, or other relative, who has been the favored and beloved companion of the testator's life, whom he had uniformly pointed out and always and invariably, through his whole life, declared his intention of making his heir, and in whose favor a prior will was duly executed. Suppose the devisee in this supposed will was some worthless fellow, unknown to the testator, or, if known, despised or abhorred by him. Suppose the witnesses to be of the same character, low and degraded, with whom the testator never associated. Would not such facts, if clearly proved, condemn such instrument in the mind of every rational man? Would not the moral impossibility that the testator could ever have made such a disposition of his property be sufficient to outweigh the positive testimony of such witnesses?

"It is easy to forge the handwriting of almost any man so that it may be almost impossible for the best judges to discriminate between the false and the true, and it is too true that persons may be found willing, for a sufficient consideration, to swear to any statement of facts. Fraud can be generally proved only by circumstantial evidence. A number of distinct facts, clearly proved, may be so utterly inconsistent with the truth of the instrument as most satisfactorily to establish the fraud. The fact that the testator had uniformly, through his whole life, declared that he intended a certain relative to be his heir, that he made his will in his favor, may be an important link in the chain of circumstances from which fraud, perjury, conspiracy, and forgery may be clearly proved."

See, also, remarks of Jessol, M. R., on the competency of declarations in general, in *Sugden* v. *Lord St. Leonards*, L. R. 1 P. D., at page 241.

Again, we are unable to perceive a distinction in principle between the competency of declarations in a case like this, where the fact of execution is in question, and in one where the will is assailed as the product of fraud and undue influence. In the latter case, the authorities generally concur in holding that the declarations of the testator and his relations with the parties are competent circumstances tending to throw light upon his state of mind and disposition. The only limitation is, that it shall not be received as proof of the independent fact or the truth of the things declared, but as suppletory only to direct proof of the alleged fraud and undue influence. Some of these cases show the admission of such declarations upon very slight foundation of the direct proof first required. *Stephenson* v. *Stephenson,* 62 Iowa, 163; *Lane* v. *Moore,* 151 Mass. 87 (gift by endorsement and delivery of note). See, also, *Parsons* v. *Parsons,* 66 Iowa, 754, 758; *Woodbury* v. *Woodbury,* 141 Mass. 329, 334.

The question at issue in each class of cases is practically the same: Did the testator execute the paper of his own accord? Did he execute it at all? And the danger that the jury answering either question may give undue weight to the declarations and conduct of the testator is equal. All that the court can do, under the circumstances, is to caution the jury against such conduct, as was done in this case, and to set aside the verdict when convinced that the caution was unheeded.

In the peculiar conditions of this case, it seems to us that any evidence from which it might be inferred that the testator would, or would not, have made such a will, would be a material aid in resolving the doubt created by the other evidence whether he did or did not write and sign it. If the proponents had produced a witness of undoubted veracity and disinterestedness, who could testify to declarations of the testator referring to and certainly identifying this particular will as having been written, signed and witnessed, as it appears to be, would not its reception and con-

sideration have been in accord with the dictates of reason and justice?

In order to prevent injustice, courts have even permitted the declarations of the testator to be given as suppletory proof of legal execution where a subscribing witness has either forgotten the facts stated in the attestation, or testified in denial of the same (*Will of Cottrell*, 95 N. Y. 329, 337; *Beadles* v. *Alexander*, 9 Baxter, 604); and also where it appeared doubtful if the formalities of the law had been complied with in the execution of a codicil. *Adams* v. *Norris*, 23 How. 353, 368.

Why, then, for the same reason, should not testimony be received from which the jury might, in case of doubt, infer that the testator had not written or executed the instrument at all? Would it not be important to know the character and state of mind of the testator in such a case? If a man of education and character, was he in a condition, mental or otherwise, to induce him to dissemble his affections and feelings for the parties or any one of them? Was there any cause or reason why he should falsely express his affections or dislikes, or should undertake to create hopes and expectations in the minds of his next of kin that he knew would be cruelly disappointed by the production of this will made years before? In short, what was the real state of the testator's mind and feelings before, at and after the alleged date of the execution, in relation to his property and the conflicting objects of his bounty?

The materiality of this inquiry, under the circumstances surrounding this will, seems plain to us.

The length of time of the declarations after the date borne by the instrument is of no materiality; for, if the instrument be a forgery, the person procuring it would naturally give it a date when the disposition would seem more reasonable or more in accord with the testator's sentiments than at a later period; besides it would be a reasonable precaution to antedate a well-known change therein.

4. It follows from we have heretofore said, that the testator's declarations tending to show the making of a will in Washington Holt's favor, or appointing him his executor, were not competent to prove the execution of such a will either as a disposition of the estate or as a distinct revocation of the will offered for probate. They were admissible, and seem to have been admitted, only as one among other circumstances tending to show the state of mind of the testator and shed light upon the issue of revocation, by mutilation, of the will offered for probate; and as such we have held them admissible on the issue in respect of forgery also. The court gave a number of instructions asked by the caveatees respecting the effect of the proof of a supposed later will, and none seem to have been prayed by the caveators. Had the twelfth and thirteenth prayers of the caveatees been modified so as to thus limit the weight or effect of this evidence of a different will, it would have been the duty of the court to grant them. If, however, palpable error had been committed in this respect, the judgment would not be reversed, because it stands upon the verdict finding the will to be a forgery. Having so found, the jury could only answer the remaining question as they did—not revoked because never executed.

5. The next question arises on exceptions taken to the action of the court in permitting witnesses for the caveators to express opinions, founded upon their knowledge of the legal attainments and literary culture and style of the testator, that the will had not been written by him; and also in excluding like evidence when offered in rebuttal by caveatees.

Many genuine letters and documents of the deceased were in evidence for the consideration of the jury. Evidence was also given showing peculiarities of the testator in the matter of punctuation.

Among the witnesses who expressed opinions against the genuineness of the will and signature of the testator were

several who said, in addition, that they had the same opinion because of the style of the composition. One testified that this was the chief ground of her opinion.

Two of them, officers who had served with the testator in the office of the Judge Advocate and were familiar with his handwriting, testified to the depth of his legal learning and the excellence of his English composition. One of these said of him: "He had the clearest power of expression and was the finest rhetorician witness had ever met." Both criticised the word "inherit" as used inartificially in the will, and one of them said he did not think the testator would so use the expression.

Attention has been directed, on the argument, to the words following the recital of the name of the executor, Luke Devlin: "Whose character I believe to be of the highest standard;" but we do not find that any witness referred to them.

In the course of their rebuttal, the caveatees proved by John A. Bingham, long and intimate acquaintance with the testator and familiarity with his handwriting, style of composition and general attainments. But the court refused to permit him to express an opinion in favor of the genuineness of the will and signature, formed upon either or both grounds.

It will be remembered that when the caveatees first closed their case they were admonished by the court that the rule in respect of rebuttal evidence would be rigidly enforced; and that they thereupon withdrew the announcement and examined a number of witnesses whose opinions were that the will and signature of testator were genuine. It does not appear that there was any reason why this witness could not have been called on the matter of the handwriting, simply, in the opening.

(1) Questions in respect of the order of the introduction of evidence are matters of such broad discretion with the trial courts that its exercise will not be disturbed except

when abused. *Lansburgh* v. *Wimsatt,* 7 App. D. C. 271, 276; *Olmstead* v. *Webb,* 5 App. D. C. 38, 57; *First Unitarian Church Soc.* v. *Faulkner,* 91 U. S. 415, 418.

(2) If there was error in refusing to permit evidence by this witness in rebuttal of the opinions founded on the testator's style of composition, it was cured by the subsequent action of the court.

For the same reason, it is not necessary to determine whether the opinions of witnesses concerning the genuineness of a writing are admissible when founded wholly or in part upon their knowledge of the technical learning, culture and literary style of the alleged writer.

It appears that when the case was closed, the court instructed the jury to disregard all opinions as to the falsity of the papers, founded " either wholly or in part upon the character of the composition, or upon any other circumstance than the handwriting alone."

We are not prepared to admit as clear, that evidence of opinion in respect of the authorship of a paper-writing by a competent judge familiar with the learning, culture and literary style of the alleged writer, is not equally competent and credible with that based solely upon knowledge of handwriting. But, conceding its incompetency, the error was corrected by the charge withdrawing it from the consideration of the jury. This rule of practice is well settled in the courts of the United States, if not elsewhere. *Pennsylvania Co.* v. *Roy,* 102 U. S. 451, 458.

It is only in a clearly exceptional case that error will be considered when assigned on the admission of incompetent evidence that has subsequently been withdrawn from consideration by the charge of the court. *Hopt* v. *Utah,* 120 U. S. 430, 438; *Waldron* v. *Waldron,* 156 U. S. 361, 383. Those exceptional conditions are not found here.

6. The last exception, upon which error has been assigned, also relates to the exclusion of evidence offered by the caveatees in rebuttal.

In opening their case, they offered P. Tecumseh Sherman as a witness, and he expressed the opinion that the signature of his mother, Mrs. Ellen B. E. Sherman, was genuine. He was not called upon to give an opinion as to the genuineness of the signature of his father, General W. T. Sherman. That was proved by Senator John Sherman.

Caveators introduced a witness, John B. Randolph, who testified that he had been employed for more than thirty years in the office of the Secretary of War, during which time U. S. Grant and W. T. Sherman had each acted as Secretary of War, and the latter had been General of the Army. During this service he had become familiar with their signatures, and had recently re-examined them. In his opinion neither signature attached to the will was genuine. On cross-examination, among other specifications of peculiarities in the genuine signature of General Sherman, he said that, "in the long quirl to the capital T the upper and lower lines met," and that he had "never seen one in which they had not met." Subsequently he said that "in four out of five" genuine signatures observed by him, the upper and lower lines of this "quirl" met. (They do not meet in the signature attached to this will.) He also thought the loop in the S was larger than usual.

Caveatees, in rebuttal, offered to prove by the witness, P. Tecumseh Sherman, that this failure of the lines to meet was "by no means an unusual feature in the signature of General Sherman, and that it is frequently, if not habitually, found therein;" and, also, that loops at the bottom of the S as large as that in the signature to the will were also usually found. The court excluded this evidence, on the objection of the caveators that it was not competent rebuttal.

Referring again to the express and timely notice heretofore mentioned as given by the court as regards the order to be observed in the introduction of the evidence of handwriting, which was acquiesced in by the caveatees, and

considering the fact that this witness, though examined in the opening, had not been asked a question concerning this signature, we think it was within the discretion of the court to exclude his testimony.

We have had some doubt whether that part of it referring to the manner of making the "quirl" was not admissible as tending to rebut that part of the witness Randolph's testimony. Had Mr. Randolph testified that the peculiarity mentioned by him invariably appeared in the genuine signature of General Sherman; or had the witness offered in rebuttal examined the signatures of General Sherman in the office of the Secretary of War and been prepared to state that they did not show the peculiarity mentioned by Randolph, the evidence would have been competent in rebuttal.

But Randolph did not say that this was invariable. He gave the proportion of its occurrence as about "four out of five." This might have been true as regards the signatures examined by him, and not true of those most familiar to the son of General Sherman.

What the latter proposed to state was that this continuous opening between the lines was not an unusual feature of the signatures familiar to him. What the former had said was, that, in the proportion of four to one, the signatures with which he was familiar did not show this continuous opening, and it does not appear that it was proposed to contradict this statement directly by the evidence offered in rebuttal.

Whilst inclined to the opinion that the discretion of the court might well have been liberally exercised in favor of the admission of this evidence, we do not think that its exclusion, considering, too, the indirect and slight contradiction between it and the evidence of Randolph, was an error for which the judgment should be reversed.

We are of opinion that the judgment should be affirmed, with costs; and it is so ordered. *Affirmed.*